658

RAMÓN OCASIO, Plaintiff and Appellee, *v.* ANDRÉS DÍAZ, Defendant and Appellant (Case No. R-85) ; REINALDO LEÓN, ETC., Plaintiff and Appellee, *v.* JOSÉ L. ZAYAS, Defendant and Appellant (Case No. 12490) ; FÉLIX LÓPEZ, ETC., Plaintiff and Appellant, *v.* NICOLÁS CANCELA, Defendant and Appellee (Case No. R-275) ; CARMEN GLORIA RIVERA, ETC., Plaintiff and Appellant, *v.* ARTURO DEFONTAINE, Defendant and Appellee (Case No. 11437) ; ANGELITA ROBLES, ETC., Plaintiff and Appellee, *v.* MARIO HERNÁNDEZ, Defendant and Appellant (Case No. 11657) ; IRIS CAÑIZARES QUIÑONES, Plaintiff and Appellee, *v.* JOSÉ GODREAU, Defendant and Appellant (Case No. 11377) ; ROBERTO CASTILLO, ETC., Plaintiff and Appellant, *v.* MANUEL NIEVES BONET, Defendant and Appellee (Case No. R-62-164) ; ESTHER CAMACHO TORRES, Plaintiff and Appellant, *v.* ANGELINA TORRES ET AL., Defendants and Appellees (Case No. R-62-215).

Nos. R-85*, etc. Decided June 27, 1963.

---

* COMPILER'S NOTE: This opinion overrules the cases of *Miranda* v. *Costa*, 77:749, *Alvarez* v. *Alvarez*, 77:862, *Sánchez* v. *Díaz*, 78:771, *Márquez* v. *Avilés*, 79:816, *Ex parte Vélez*, 81:634 (partially overruled), and the cases recited in footnote 5 of this opinion.

*Félix Ochoteco, Jr.,* and *José Luis Feliú Pesquera* for appellant. *José C. Jusino* for appellee.

*E. Ramos Antonini* and *Alvaro Ortiz* for appellant. *Ramón R. Cabrera* for appellee.

*Mario Báez García* for appellant. *Amador Ramírez Silva* for appellee.

*B. Sánchez Castaño* and *R. Rivero Cervera* for appellant. *Antonio J. Matta* for appellee.

*E. L. Belén Trujillo* for appellant. *Mario A. Rodríguez* for appellee.

*Leopoldo Tormes García* for appellant. *Inéz Acevedo de Campos* and *Rafael Muñoz Ramos* for appellee.

*José Rafael Gelpí* for appellant. *Ildefonso Freyre* for appellee.

*Enrique González, Luis E. Gandía Argüelles, Justina Carrión de González, Mariano Canales,* and *Enrique Segarra* for appellant. *Félix Ochoteco, Jr., Rivera Zayas, Rivera Cestero & Rúa, Miguel Ángel Ortiz Lugo,* and *F. Fernández Cuyar* for appellees.

Mr. Justice Hernández Matos delivered the opinion of the Court.

Because of the similar relation existing between the eight above-entitled actions of filiation, this Court has agreed to consolidate them for the purpose of deciding them jointly in a single opinion.

In order to have a clear and orderly relation of the facts and circumstances in each appeal and for a better understanding in the application of the constitutional and statutory provisions involved, we shall state briefly and separately the events of greater significance for the purpose of rendering judgment in each case, respectively. We shall begin with the second appeal in the order of titles stated, that is, with the case of Reinaldo León, No. 12490, and we shall continue until the eighth appeal of Esther Camacho Torres, No. R-62-215. Afterwards, but in a more ample and detailed manner, we shall refer to the first appeal, that of Ramón Ocasio, No. R-85 (the study of which was almost finished when we decided to consolidate the cases), arguing the questions in dispute in these eight appeals. At the end of the present opinion we shall render the judgment in each case.

*REINALDO LEÓN, ETC.* v. *JOSÉ L. ZAYAS, No. 12490.* Plaintiff was born on December 3, 1938; his father was married; the action was brought in May 1956, for all purposes, on the ground of the uninterrupted possession of status of natural child; the defendant, in answering the complaint of filiation, accepted "each and every one of the facts alleged in the complaint", but "the acceptance was made on condition that judgment be rendered declaring plaintiff his acknowledged natural son for the sole purpose of bearing his name." Subsequently, in answering under oath an interrogatory presented by the plaintiff, he stated that "Reinaldo León is the fruit of his relations with Eladia León" and that "it is true that the defendant has furnished economic aid to plaintiff Reinaldo León on occasions that the latter has come to Coamo" and that he so stated to plaintiff's counsel. Final

judgment was rendered on February 28, 1958, on the pleadings, the interrogatory and the verified answer thereto, declaring plaintiff "the acknowledged natural son of defendant José L. Zayas, with all the rights as such child and without any limitation."

On appeal two errors are assigned: (1) in declaring plaintiff the son of the defendant for all legal purposes on the basis of what was accepted in the answer to the complaint and in the interrogatory; and (2) in rendering judgment for the plaintiff "in the manner it did." In the discussion, Act No. 229 of 1942 and its amendment by No. 243 of 1945 are invoked as well as the doctrine laid down in *Alvarez* v. *Alvarez*, 77 P.R.R. 862 (Sifre) (1955). Appellant maintains that there was no voluntary acknowledgment.

*FÉLIX LÓPEZ, ETC.* v. *NICOLÁS CANCELA, No. R-275.* Plaintiff was born on May 2, 1944; his father was married; action filed on August 6, 1959; it is based on concubinage and on the uninterrupted possession of the status of natural son; judgment was requested for the sole purpose of bearing the father's name—it should be noted that the son was born in May 1944—the answer denied all the facts alleged in the complaint; trial was held on the merits on January 8, 1960; on one of the findings of fact the trial judge found that "the defendant Nicolás Cancela . . . is, in the opinion of the court, the father of the minor plaintiff"; however, judgment was rendered on January 25, 1960 dismissing the complaint under the requirements of proof of § 125, because "there never existed a state of concubinage", citing *Rodríguez* v. *Cruz*, 68 P.R.R. 696, 700 (1948); *Sánchez* v. *Díaz*, 78 P.R.R. 771, 774 (1955), and *Armaiz* v. *Santamaría*, 75 P.R.R. 544 (1953). On review the sole error assigned was "in deciding that the evidence . . . did not establish the existence of a state of concubinage" and that the latter is indispensable "even if paternity has been proved."

*CARMEN GLORIA RIVERA, ETC.* v. *ARTURO DE-FONTAINE, No. 11437.* Plaintiff was born on December 9, 1942; her father was married; the action was filed in April 1953 on the basis of concubinage and of possession of status of natural child; judgment was requested for all legal purposes; in his answer defendant father merely denied that the plaintiff ·"was born in Fajardo on December 4, 1943" and as special defenses he alleged that at the time referred to in the complaint he was a married man but had been divorced after the birth of the plaintiff; that "at the time that the minor Carmen Gloria Rivera was conceived, since the defendant was a married man, said child was adulterine" and that "the defendant has no objection that the minor bear his name but without hereditary rights," praying the "court . . . to render judgment in due time declaring the minor Carmen Gloria Rivera the daughter of the defendant but merely with the right to bear his name"; a motion for summary judgment was dismissed; the trial was held in March 1954; the trial judge determined that the plaintiff was the daughter of Arturo Defontaine. Judgment was entered on May 27, 1954 granting the complaint (although in one of its conclusions of law the trial court stated that "filiation does not lie in this case", because the requirements of § 125 of the Civil Code have not been met) "for the sole purpose of using the name of the defendant father" but "dismissed as to the right to inherit . . . ." On review plaintiff alleged as error (1) the dismissal of the motion for summary judgment; (2) in refusing to plaintiff "the filiation claimed" and (3) in not granting attorney's fees. The discussion touches on the application to the case of § 125 of the Civil Code and of other decisions of this Court, among them *Vargas* v. *Jusino,* 71 P.R.R. 362, 368 (1950).

*ANGELITA ROBLES, ETC.* v. *MARIO HERNÁNDEZ, No. 11657.* Plaintiff daughter, whose name is Alba Nydia

Robles, was born in November 1948; of married father; action was filed in July 1954 for all legal purposes, on the ground of concubinage and the possession of status of natural daughter of defendant father; the latter denied paternity; the trial was held on March 1, 1955; in its findings of fact the judge considered as proved the paternity on the basis of the uninterrupted possession of the status of natural daughter. He rendered judgment on March 9, 1955 declaring plaintiff the natural daughter of defendant father for all legal purposes, with imposition of costs and attorney's fees. On appeal the father assigns as error that the court found proved the uninterrupted possession of status of natural daughter and in having decided "that once the paternity is established by judgment the acts which give rise to the acknowledgment do not have to be the same required if the paternity had not been already established." He invokes the doctrine of *Vargas* v. *Jusino, supra*. The respondent maintains, correctly, that the trial judge had before him sufficient evidence to conclude that the plaintiff enjoyed said uninterrupted possession of status of natural daughter of the defendant father warranted by direct acts of the father. The testimony of Angelita Robles González, Conchita Vélez and defendant himself constitute sufficient basis to consider as established the fact of the paternity proved by the uninterrupted possession of status.

*IRIS CAÑIZARES QUIÑONES* v. *JOSÉ GODREAU, No. 11377*. The son, Víctor Manuel Cañizares, was born on December 13, 1951; at the time of his conception the parents were unmarried; the defendant father contracted marriage with another woman in August 1951; the complaint was filed on February 7, 1952, containing two causes of action, one of filiation for all legal purposes, based on "notorious and public concubinage relations" and the other for support. With respect to the first cause of action defendant answered denying its allegations; he set forth that the mother, during the

period she alleged to have had relations with the defendant "was a public woman who had marital relations with different men in this city of Ponce." He denied the facts stated in the second cause of action for support. The case went to trial on April 13, 1953. The trial judge concluded that the plaintiff child "was in the uninterrupted possession of status of natural child of José Godreau, justified by actions of the latter." He found proved the public and notorious concubinage between his parents at the time of his conception, and, further, that both could have intermarried at that time. He found proved that "on February 12, 1952, a hearing was held pursuant to Act No. 108 of 1940, and the defendant accepted the paternity and alleged being willing to pay a monthly allowance of $10 to said child, which amount he has been paying him since that time." With respect to the scope and significance at law of these acts, the judge correctly stated thus:

"If the admission of paternity under the procedure established by Act No. 108 had no other juridical scope but to guarantee a morsel of bread to a child, nor any other juridical consequences than to contract an obligation to mitigate hunger slightly, we would be giving it a juridical scope of excessive limitations. Although it is true that Act No. 108 is an Act of a procedural character and that its purpose as such is to insure support for the minors, § 4 thereof establishes a procedure by virtue of which the respondent is given the opportunity to accept or deny the paternity. Once the paternity has been accepted it cannot be rejected. In the case of *Nicolás Cortés Córdova* v. *Alfredo Cortés et al.,* our highest court said: 'The mere fact of the acknowledgment implies the legal consequences we have mentioned and the predecessor may not, by statement, curtail or limit such legal consequences, nor cut down the hereditary rights of his natural children validly recognized, just as a testator can not deprive forced heirs of their legal portion. Once the father validly recognized those two children, he could not by himself limit the scope of the Act.'

"Although it is true that in the case at bar we are not dealing with the acknowledgment but rather with the admission of paternity, since it was made within a judicial proceeding and not voluntarily in a public document, that is, at a hearing pursuant to Act No. 108, the admission of said paternity can not have the limited scope of a mere obligation to pay support. For the purposes of the proceedings of Act No. 108, since that is its only purpose, that is its scope, because of its consequences of perpetuity and publicity they produce the juridical consequence of making it the authentic proof of paternity."

The judgment of June 25, 1953 granted the complaint in its two causes of action, acknowledging the plaintiff child as the acknowledged natural son of the defendant father and imposing on the latter the payment of $20 monthly for the support of his son, with costs and attorney's fees. Subsequently the court amended its judgment to the effect that the amount granted for support be paid "from the filing of the complaint." On appeal three errors were assigned: (1) in deciding that the judgment rendered under Act No. 108 of 1940 "has produced the status and that it is only necessary to prove the paternity", for the purpose of establishing the uninterrupted possession of status; (2) "In admitting in evidence the record of the Municipal Court in case No. 52-184, an action for support against José Godreau, as an authentic document, establishing filiation . . ." and (3) in weighing the evidence.

The order entered in case No. 52-184, rendered by the Municipal Court of Ponce, reads as follows:

"In the Municipal Court of the Municipal Judicial District of Ponce, P.R.—The United States of America, The President of the United States, The People of Puerto Rico v. José Godreau.— Criminal Case No. 52-184. For: Abandonment of Minors (Act No. 108 of 1940).—MINUTES OF THE HEARING.—The hearing of this case having been set for today, pursuant to Act No. 108 of 1940, both parties appeared. Petitioner alleged that the defendant is the father of the minor Víctor Manuel, two months old, and that he has abandoned him without any legal excuse, failing

to furnish the necessities for the support and maintenance of said minor. The defendant accepted the paternity and alleged being willing to pay an allowance of $10 monthly to said minor. The undersigned judge made the legal warnings to the parties on the matter and ordered that the case be dismissed and that in case of failure to comply with the obligation of paying the allowance of $10 to said minor, the case be transferred to the jurisdiction of the Minor's Guardianship Court.—Ponce, P.R., February 12, 1952.— (s) Jorge Meléndez Vela, Municipal Judge."

*ROBERTO CASTILLO, ETC.* v. *MANUEL NIEVES BONET, No. R-62-164.* Child born on June 17, 1944, of married father; the action was filed for all purposes in October 1961—based on the uninterrupted possession of status of natural child of the defendant father; in his answer the latter denied the averments of the complaint; the case went to trial on March 1, 1962; in its findings of fact the trial court determined that the plaintiff was the son of the defendant father and that the latter "after the child was born began to give him $5 weekly, and also on certain occasions brought him food from a grocery belonging to him . . . the defendant having continued to pay him said $5 until plaintiff went to New York in 1946." In its only conclusion of law the trial judge stated: "Although we have found as proved that the defendant is the father of the minor plaintiff, the evidence presented by the plaintiffs is not sufficient to establish that the minor has enjoyed at any time the uninterrupted possession of status of natural child of the defendant, it being an inescapable conclusion that the action of filiation should be dismissed." It cites *Berdecía* v. *Tyrell,* 82 P.R.R. 674 (1961). Consequently, on May 2, 1962 it rendered judgment dismissing the complaint. Subsequently plaintiff filed a motion for reconsideration of judgment praying that "the complaint be granted for the sole purpose that the minor bear the name of his father." It was based on *Figueroa* v. *Díaz,* 75 P.R.R. 152, 163 (1953); *Salas* v. *Doe,* 75 P.R.R. 496 (1953), and *Cruz* v. *Santiago,* 24 P.R.R. 100 (1916). The motion for

reconsideration was flatly denied. On review the plaintiff-appellant assigns the commission of five errors: (1) in dismissing the filiation notwithstanding the fact that it concluded that the plaintiff was defendant's child; (2) and (3) undue application to the case of § 125 of the Civil Code; (4) in failing to apply "the rules of evidence at the time of the trial and applying instead those existing at the time of the conception of the minor, and (5) in rendering "a premature judgment pursuant to Act No. 229 of 1942, which is unconstitutional because it constitutes an invasion of the legislative power against the judicial power tending to hamper the function of the courts."

In discussing the fourth assignment in his brief appellant raises the question that after the approval of the Constitution, § 125 of the Civil Code "does not govern those cases, it being only necessary to prove the paternity," citing in support of this contention the ruling in *Pabón* v. *Morales*, 79 P.R.R. 146 (1956), and "the equality of rights granted in a general way to all the children by the Constitution." Act No. 229 of 1942 is alleged to be unconstitutional because it discriminates between a child voluntarily acknowledged by his father and the child so declared by the court, inasmuch as the former is granted the right to inherit from his father who acknowledged him, while the latter is denied that right.

On the other hand, the appellee maintains that the law applicable to the case is Act No. 229 of 1942, because the minor was born in 1944; that in that case "to obtain his filiation he must prove at least one of the requirements set forth in § 125 of the Civil Code . . ." and that none of said requirements were proved; that the paternity is not established "by mere unauthentic proof of the paternity, . . ." and that neither the Constitution nor Act No. 17 of August 20, 1952, nor the doctrine of the case of *Pabón* v. *Morales*, *supra*, are applicable to the case inasmuch as plaintiff's birth took

place in 1944, under the provisions of Act No. 229 of 1942 and that said § 125 should be applied.

*ESTHER CAMACHO TORRES* v. *ANGELINA TORRES ET AL., No. R-62-215.* Daughter born in December 1927, of married father; the action of filiation was filed on November 9, 1959, based on the uninterrupted possession of the status of natural daughter; also the complaint challenges the entry made in the Registry of Vital Statistics in connection with plaintiff as the alleged legitimate daughter of Agustín Camacho, who contracted marriage with plaintiff's mother when the child was 6 years of age; the action of filiation against the heirs of her father, Rafael Arrieta Ríos, who died on November 8, 1958, was introduced; the action of impeachment of the birth certificate against Angelina Torres, plaintiff's mother, and her present husband Agustín Camacho. An amended complaint was filed in February 1960. The mother and stepfather of the plaintiff answered the amended complaint accepting as true all its allegations; the codefendant heirs Rafael and Carmen Arrieta Negrón filed a memorandum of defenses and objections of law against the amended complaint alleging (1) the legal incapacity of the plaintiff "to challenge the legitimacy of her birth as it appears from the Registry of Vital Statistics"; (2) that the action of challenging had prescribed; (3) that it did not state "a claim warranting the prayer of the plaintiff." In their fourth defense and objection of law they textually stated:

"4. That in the event that the Amended Complaint stated a claim, and that the plaintiff was the daughter of the defendants' father, Rafael Arrieta Ríos, which is denied by defendants, plaintiff could only be declared the daughter of the deceased, without any right to inherit from him, because the latter, at the time of the conception, as well as the time of plaintiff's birth, was married to Margarita Negrón since May 24, 1913, the latter person not being the mother of the aforesaid plaintiff; *Alvarez* v. *Alvarez,* 77 P.R.R. 862; *Sánchez* v. *Díaz,* 78 P.R.R. 771; and *Márquez* v. *Avilés,* per curiam decision of our Supreme Court

of May 29, 1957, affirmed in *Márquez* v. *Avilés*, 252 F.2d 715, since it is not alleged in the Amended Complaint that there exists a public document in which the alleged father of the plaintiff had acknowledged her as such daughter, nor was said acknowledgment established in the birth record, or by voluntary action of her alleged father, or, in default thereof, by the persons entitled to his inheritance (31 L.P.R.A. 502 and 504)."

On the basis of those objections of law Judge Luis R. Polo, on January 12, 1961 rendered judgment dismissing the complaint "as to her claim of hereditary rights", but it ordered that the case be continued for other purposes. The codefendants further answered the amended complaint, accepting the death of Rafael Arrieta Ríos on November 8, 1958, denying that plaintiff was his daughter and that the latter had enjoyed the uninterrupted possession of the status of the daughter of the predecessor and other facts, accepting the alleged registration of plaintiff in the Registry of Vital Statistics as the legitimate daughter of Agustín Camacho and that the predecessor left property, but denying that plaintiff "is entitled to the same under the title of inheritance or under any other title." They also alleged that in the event that plaintiff was predecessor's daughter, she would only be entitled to bear his surname but never to inherit from him.

The other defendant coheirs answered the complaint in the same terms as the answer of coheirs Rafael and Carmen Arrieta Negrón. After a trial, final judgment was rendered on June 29, 1962 declaring plaintiff the daughter of Rafael Arrieta but limiting the determination to the sole right of bearing her father's surname and decreeing the nullity of her registration as daughter of Agustín Camacho.

From this judgment plaintiff Esther Camacho Torres alone has moved for a review and she maintains in this Court that since her father died in 1958, she is entitled to inherit from him, and that all authority or decisions contrary thereto should be overruled. In its findings the court determined

that the plaintiff "is the daughter of Rafael Arrieta" and that that paternity had been established as a matter of law and that further "the plaintiff enjoyed the uninterrupted possession of status of daughter of Arrieta, evidenced by the actions of her father."

In those findings of fact the trial court, speaking through Judge Miguel A. Velázquez Rivera, stated:

"It is well known that the Act of 1942 in these cases limited the rights of the children who were adulterine to the right of support when the father was alive and to the right of bearing the father's surname.

"However, Section 1 of Article II of the Constitution of Puerto Rico eliminated any discrimination by reason of birth. That constitutional provision was implemented by Act No. 17 of August 20, 1952, which provides that all the children with respect to their parents and to the property left by them have the same rights as the legitimate children.

"The Supreme Court of Puerto Rico decided in the case of *Márquez* v. *Avilés* that that provision of the Constitution and the provision of the Act are not retroactive. That is, such is the law in Puerto Rico.

"The court wishes to state specifically that it believes and understands in good faith that that decision of the Supreme Court is entirely mistaken, because it did not take into account, as it did in the former decisions on the same matter, that the important fact in avoiding the discrimination that the Constitution seeks to avoid is not the date of birth of the plaintiff, but the date of the death of the father. That is, that if at the death of the father the Constitution and the Act of August 1952 were already in effect, it is at that moment that the transfer of the right takes effect. Therefore, if the child already exists, no discrimination should be established by reason of his birth. But this Judge, by reason of his office, has a primary obligation and that obligation is to abide by the law. The law has been established by the Supreme Court of Puerto Rico in *Márquez* v. *Avilés*, and this Judge would be the last person to disobey that law, no matter what he thinks as to the merits of said ruling."

By the briefs filed and the arguments presented by the parties at the hearing on May 23 last, the issue in this case was limited to the following question: whether the doctrine in the case of *Márquez* v. *Avilés*, 79 P.R.R. 816 (1957) is erroneous or not; in the first case the judgment appealed from should be affirmed; in the second case, that doctrine should be overruled and the judgment modified declaring plaintiff to be also an heir.

As we already announced, we shall now turn to a detailed exposition of review No. 85, *Ramón Ocasio* v. *Andrés Díaz*. In the course of the ample discussion and study that we shall make hereof we shall state our views on the different questions raised and debated in the eight proceedings under consideration and on the basis of which we shall dispose of them.

In the case of *Ocasio* v. *Díaz*, review is sought of a summary judgment rendered on June 5, 1958, by the Bayamón Court, granting, for all legal purposes, a filiation action filed on January 15, 1957 by an extramarital child born on January 26, 1939, of a married father and a single mother at the time of his conception and birth, the judicial declaration being based on the acknowledgment of the plaintiff child by the voluntary action of the defendant father in the answer of the complaint.

The issue turns on the legal consequences resulting from the acceptance of the paternity made by the defendant father in his answer, in the light of the principles sanctioned in our Constitution of 1952 and of the applicable provisions contained in Acts Nos. 17 of August 20, 1952 and 229 of May 12, 1942, as amended by Act No. 243 of May 12, 1945.

The chronological sequence of the facts and circumstances involved is as follows: On May 10, 1936, Andrés Díaz contracted marriage with Sixta Nieves. In 1938 Díaz had sexual relations with Carmen Ocasio, an unmarried woman. Ramón Ocasio was born from these relations on January 26, 1939.

On January 15, 1957 Ramón brings an action against his father in the Superior Court, Bayamón Part, requesting "judgment against the defendant, declaring him the acknowledged natural child with all the inherent rights to that status." In the only two paragraphs of his complaint he alleged:

"1. That plaintiff Ramón Ocasio was born from the marital relations had between the defendant Andrés Díaz and plaintiff's mother Carmen Ocasio, about the year 1938 and he was born in Bayamón, Puerto Rico on January 26, 1939 and was recorded on February 4, 1939 in the Registry of Vital Statistics under No. 7105.

"2. That since his birth plaintiff has always been held and furnished with all the necessities as a son by his father, that he has been called such publicly and on his advice and instructions he uses the surname of Díaz, which paternity and surname plaintiff must establish and legalize pursuant to law, for all legal purposes, since the defendant has not yet complied with his duty, notwithstanding the fact that he offered to do so, since plaintiff shall have to register in the military service of the United States on the 27th of this month and he must do so with his legal name, Díaz."

On January 17, 1957 the defendant father was personally summoned. On the 28th of that month he appeared in writing and moved for an extension of twenty days "to plead in the above-entitled case." The motion was granted. On February 12 following he filed "a motion to dismiss" based on the insufficiency of facts of the complaint. In the course of this incident, the parties cite, comment and argue in full the provisions of the Civil Code and special laws approved since 1942 on the filiation of children born out of wedlock, and the rights that have been recognized to them by the successive Puerto Rican legislation, including the aforesaid Act No. 17 of 1952 on the equality of the rights of children and the aforesaid principles applicable to the question, contained in our Constitution. They discussed the retroactive effect of

those provisions and the application of several of our decisions to the case. Finally the motion to dismiss did not prevail.

On June 10, 1957, almost five months after having been summoned and after that lengthy discussion on the legislation and case law relative to the rights of extramarital children, the defendant father filed his answer to the complaint. It textually reads:

"1. Of the first paragraph of the complaint the defendant *accepts that the plaintiff was born from marital relations had between the defendant ' Andrés Díaz and Carmen Ocasio*; for lack of sufficient information to form an opinion with respect to the veracity thereof defendant denies generally and specifically each and every one of the other allegations contained in the first paragraph of the complaint. (Italics ours.)

"2. Of the second paragraph the defendant *accepts that from the day of plaintiff's birth he has always attended him in all his necessities as his child.* He denies that he ever called him his son in public or that he does so at present. He denies that on his advice and instruction he used the surname Díaz. For lack of information he denies that plaintiff has to register in the military service on January 27 of this year. He denies the other allegations of the second paragraph. (Italics ours.)

"SPECIAL DEFENSE. As special defense the defendant states:

"1. That since May 10, 1936 up to the present time the defendant has been legally married to Sixta Nieves. For said reason the plaintiff could not be declared, as sought in the complaint, the acknowledged natural child with all the rights inherent to said status.

"WHEREFORE, the defendant prays this Honorable Court to enter an order pursuant to the allegations stated by the defendant."

On February 24, 1958 plaintiff filed a motion for summary judgment, together with a photocopy of his birth record. In it he accepted as true "the only allegation that the defendant has established as a special defense", that is, that his father was married to Sixta Nieves since May 10, 1936 and

that "for said reason the plaintiff could not be declared, as sought in the complaint, the acknowledged natural child with all the rights inherent to said status." In that motion he prayed:

"Wherefore, in view of *Cruz* v. *Andrini*, 66 P.R.R. 119, it is sought that he be declared the acknowledged natural child with the right to bear defendant's surname with other pronouncements that may be proper."

The defendant objected that motion on the only ground that "there is a real controversy as to the material facts alleged in the complaint." He did not attach to his opposition any documents or statements of any kind.

On June 5, 1958 the trial court rendered summary judgment in favor of the plaintiff child, not with the restrictive effects sought in the motion, but with the ample and full effects requested in his complaint. Because it is relatively brief, we insert below its complete text:

"SUMMARY JUDGMENT. We are asked to render summary judgment since in the present action of filiation the defendant accepts that 'the plaintiff was born from marital relations had between the defendant Andrés Díaz and Carmen Ocasio.'

"There is no controversy as to the fact that the child was born while the defendant was 'legally married to Sixta Nieves.' It is denied for lack of information that the alleged date of birth is January 26, 1939, but in his memorandum of opposition to the motion for summary judgment the defendant agrees that the birth was prior to 1942. The objections to the summary judgment are that the fundamental allegations of the complaint have been controverted. Thus, that the defendant held Ramón Ocasio as his son, that he called him such publicly and that he permitted him and advised him to use his surname Díaz.

"In determining this question we shall consider the child as born prior to 1942, although for all legal and practical purposes—as we shall see—it matters little in this case whether the birth was subsequent to said year.

"Our Act (31 L.P.R.A. 502) reads:

" 'Children born out of wedlock prior to the date this Act takes effect, and who lack the qualifications of natural children according to previous legislation, may be recognized for all legal purposes by the voluntary action of their parents, and in their default, by that of the persons having the right to inherit therefrom. These children will be legitimized by the subsequent marriage of the parents, to each other.

" 'In case the children referred to in this section are not recognized by the voluntary action of their parents, and in default of the latter, by that of the persons having the right to inherit therefrom, said children shall be considered as natural children for the sole purpose of bearing the surname of their parents. The action for this recognition shall be prosecuted in accordance with the procedure fixed by this title for the recognition of natural children; *It being understood, however,* That such a recognition shall only have the scope herein expressed.'

"It will be noticed from the aforesaid provision that two types of acknowledgment are contemplated for those born before 1942: voluntary and involuntary. The former, 'for all legal purposes' and the latter, 'for the sole purpose of bearing the surname.' And the action for acknowledgment shall be filed in accordance with the procedure fixed for the recognition of natural children.

"When is the father compelled to acknowledge his natural child? Our Civil Code says (31 L.P.R.A. 504):

" '1. *When there exists an indubitable statement in writing of the father wherein he expressly acknowledges his paternity.* (Italics ours.)

" '2. Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family.

" '3. When the mother was known to have lived in concubinage with the father, both during her pregnancy and at the time of the birth of the child.

" '4. When the child may present any authentic evidence of his paternity.'

"Although we agree with the defendant that he denied a number of causes of actions alleged in the complaint, we need not exert ourselves to realize that he expressly accepted his

paternity in an indubitable document such as the answer to the complaint. *Ex parte Morales*, 30 P.R.R. 848. The acknowledgment made by the father in a birth record, in a will or in any other public document constitutes a solemn act of acknowledgment of a natural child. *Amsterdam et al.* v. *Puente et al.*, 16 P.R.R. 527; *Rijos* v. *Folgueras et al.*, 16 P.R.R. 593.

> " 'The courts are always inclined to favor the natural child when the acknowledgment is manifest and made publicly, whatever the manner in which it is made, *provided there is authentic proof thereof.*' *Iturrino* v. *Iturrino*, 24 P.R.R. 439. (Italics ours.)

"It is different in the case of mere oral admissions which are made at preliminary hearings which are far from being the indubitable or solemn document. *Alvarez* v. *Alvarez*, 77 P.R.R. 862.

"The answer to the complaint in this case constitutes a valid and voluntary acknowledgment for which reason we decide to grant, as we hereby grant, the motion for summary judgment and consequently we declare Ramón Ocasio the acknowledged natural son of Andrés Díaz for all legal purposes."

The defendant moved for the reconsideration of the judgment "in the sense of limiting plaintiff's rights as defendant's son exclusively to bear his surname and consequently without any right to inherit from him." The court denied the motion.

At the request of the defendant we issued a writ of review. As an only error the latter maintains that the judgment "does not limit the rights of plaintiff therein and respondent herein to the exclusive use of the surname of defendant therein and appellant herein as his illegitimate son, but on the contrary it recognizes to plaintiff therein the right to inherit from his father, appellant herein."

I

We shall discuss in the first place the questions raised in the light of the provisions of Act No. 229 of 1942, as amended in 1945, since it concerns one more of the "children born out of wedlock prior to the date this Act takes effect, and who

lack the qualifications of natural children according to previous legislation . . .", following the tenor of that statute the text of which containing that amendment appears inserted in the judgment appealed from.

In the year 1942 our Legislature had full powers to establish, at a single time, the most complete and absolute equality before the law of all the children, without the need of having any special constitutional powers.—Sections 25 and 35, Organic Act of 1917.—But considering past experiences adverse to the solution of serious social problems at a single time and that "in social reforms of this kind prudence advises a process of evolution which will gradually correct the injustice without creating any sort of conflict,"—Minutes of the Senate, 1942, p. 800—it preferred to go carefully, step by step, on such a sensitive field as the family law. With Act No. 229 of that year it raises the heavy portal of the reform that it would accomplish in the decennial 1942–1952. By means thereof it commences by eliminating adultery from the possibilities of acknowledgment and filiation with respect to not natural illegitimate children. Later the avenues are enhanced, granting greater dignity and improving the economic future. To that effect one Act succeeds another: Acts Nos. 13 and 243 of 1945; Acts 354, 446 and 447 of 1947; Acts 171 and 255 of 1949 and Act 253 of 1950. However, for the unacknowledged adulterous child the hour of its full justice does not come until August 20, 1952 when Act No. 17 is approved as to the equality of the rights of the children, with retroactive effect to July 25, 1952.

The act *realized in June 1957* by Andrés Díaz in the course of the filiation suit in which he is sued as the father, in accepting in his answer to the complaint, and with respect to the averments in paragraph 1, that Ramón Ocasio, the youth 18 years of age who alleged to be his son and who asked the court to so declare him "with all the rights inherent to said status", was his son because "he was born out of the marital

relations between the defendant Andrés Díaz and Carmen Ocasio." Should an acknowledgment by voluntary action be determined, pursuant to that Act No. 229, valid, efficient and complete? Our immediate, categorical and precise answer is: Yes. And it is the same answer even within the restrictive and conservative criterion prevailing in *Correa* v. *Heirs of Pizá* and other decisions which we shall mention. Let us be explicit.

As we have seen, on June 10, 1957, the father accepted by public document[1] that the plaintiff was begotten from his sexual relations with Carmen Ocasio and that "since his birth" and thereafter he has furnished him "with all the necessities as a son." In other words, he expressly, directly, clearly and precisely acknowledges, proclaims and notifies, particularly the Superior Court and the other litigant party, and, in general, the society in which he lives, by means of a public document drafted and signed by an expert at law, the fact that Ramón Ocasio is the fruit of the sexual relations he had with Carmen Ocasio and that he has always attended him "as a son." This public acknowledgment of paternity which caused the judicial declaration of status of son, was verified in his answer to the complaint, five months after having been summoned in the action and having discussed intensely during that period the scope and meaning of Act No. 229 of 1942 and its amendment of 1945, as we stated at the beginning.

We are not dealing here with a declaration of paternity wrung by force, nor one in which there exists the intention of acknowledgment vitiated by or flowing from an insane person or one psychically or physically disabled to do so,

---

[1] Counsel representing appellant father in this appeal has repeatedly accepted in his brief that the Answer to the Complaint is a public document in its general sense. Of course, his position on this point is supported by the provisions of § 49 of our Law of Evidence and the ruling in *Vélez* v. *Camacho et al.*, 8 P.R.R. 35 (1905); *Ex parte Morales*, 30 P.R.R. 848, 852 (Franco Soto) (1922), and *Díaz* v. *Heirs of Díaz*, 86 P.R.R. 757 (Belaval) (1962).

nor was the acknowledged person one who intimidated the acknowledger to do so, nor was Ramón acknowledged instead of Juan, nor is it a declaration in which the circumstances on the basis of which the paternity was believed are false or nonexistent. *Cf.* § 1188, Civil Code.

The mere fact that the defendant father established or acknowledged the consanguineous bond existing between him and his son, in the course of a filiation action, does not mean that the acknowledgment was involuntary. What it really means is that in his complaint the son stated a certain and true fact and doing honor to that certainty and truth, the defendant father, who knows it, of his own will accepts it and confesses it. And he freely goes further than proclaiming his condition of father: he admits, accepts and confesses that from his birth and thereafter he has attended him in all his necessities *as a son*. If after a sincere examination of his conscience he decided to comply with his moral—which is also juridical—duty of acknowledging that truth, which constitutes a due reparation by the natural laws to his son as well as to the woman who gave him birth, why should we decide that he did not do it freely and voluntarily or without the intention of acknowledging? As Albaladejo says in *"El Reconocimiento de la Filiación Natural"*, p. 190, Barcelona, 1954, ". . . normally the true declaration of the acknowledgment of paternity implies the will of the acknowledger to declare it." There may be some cases perhaps where it is not so, as the author himself states. But nothing more than the weight of his own conscience of father or his sense of the moral, social and ethical duty toward his son, or his respect for the truth, obliges him to acknowledge by himself that paternity. In our procedural system it is expected that the parties will speak the truth, in obedience to the law and elementary respect to justice. They should make averments of fact in conformance with the truth. The Rules of Civil Procedure do not contain any reproach of a criminal tenor for the defendant who does

not answer a complaint or who fails to accept the truth of the facts properly alleged therein. They do not preclude a father, within an action of filiation, from choosing by his voluntary action, to occupy juridically his position of father and spontaneously relate the facts that originated that situation, with all the juridical consequences that might ensue, as Andrés Díaz did herein.

Act No. 229, which grants to the father the power of acknowledging the fruit of his sin, which was formally denied in cases such as the present one; which gives him the opportunity of being the first one to dignify him, does not require that it be exercised at a specific moment, nor does it fix the place nor the manner of doing it. At his discretion, freely and without strings, wherever and whichever way he wishes, and up to the very last instance of his existence, he may "pour upon the head of his son, either by pity or mercy, the precious ointment of filiation."

The spirit of the generous legislative and jurisprudential evolution with respect to children born out of wedlock, precludes the child who has been voluntarily acknowledged by his father, from enjoying partially and not fully, the prerogatives inherent to filiation. A father who by virtue of his act creates a paterno-filial situation which did not exist formerly, should not be allowed to destroy his child economically by setting up an unsurmountable barrier between him and his property, nor should the child be allowed to consent to his own destruction. Sections 744 and 1713 of the Civil Code prohibit all renunciations or compromises with regard to a future legal portion, the civil status or future support.

Acknowledgment is a juridical act. Its effect is the constitution of the status of son or daughter. By itself it is not an act creating rights and obligations. These are not granted nor imposed by the will of the father, who merely has the autonomous power of giving life to the declaration of

paternity. It is the law which considers him as the cause of specific juridical effects, attributing to that status the prerogatives it defines.

As we said in *Cortés* v. *Cortés*, 73 P.R.R. 643, 654 (Ortiz) (1952), "the mere fact of the acknowledgment implies the legal consequences we have mentioned and the predecessor may not, by statement, curtail or limit such legal consequences, nor cut down the hereditary rights of his natural children validly recognized, just as a testator cannot deprive forced heirs of their legal portion. Once the father validly recognized those two children, he could not by himself limit the scope of the Act."[2] We likewise stated in *Rivera* v. *Rivera*, 78 P.R.R. 865 (Saldaña) (1956).

---

[2] Albaladejo, on page 44 *et seq.*, *op. cit.*, comments:

". . . These effects are produced, hence, *ex lege* and not *ex voluntate*. They are produced because acknowledgment was made irrespective of whether or not they appear as wanted. Unlike the effects of the juridical business which, in principle, are produced because they appear as wanted by its author, provided they are in conformance with and not contrary to the provisions of the juridical order.

"That the production of the effect takes place *ex lege* is deduced from the following:

"1. The acknowledgment does not contain essentially the expression of a business will, but merely an affirmation of paternity. Hence, the effects of the act cannot be based on a private wish which need not exist.

"2. If the father, upon solemnly declaring his paternity states at the same time that he does not wish to give his son a status, but merely to establish his biological paternity, the status will still be attributed to him.

"It should be noted that in opposition to the foregoing it cannot be alleged that in the family law the effects are frequently produced *ex voluntate* and, yet, the private individual is not granted the power of limiting or modifying them. And it should be understood that the effect in the acknowledgment would be produced *ex voluntate*, but that the acknowledger is not permitted to oppose the aforesaid protest the same, as for example, is not allowed to contract marriage *sub conditione*.

"This objection would be mistaken insofar as in the case of acknowledgment under protest of not wanting to attribute status to the acknowledged child, there precisely exists the only premise on

■ . It is true that the admission, acceptance or confession of facts in a judicial controversy constitutes a probative function: it builds evidence against its author, relieves the other party of the burden of proof, and, generally, compels the trial judge to render judgment on the facts admitted, accepted or confessed. *Cf.* sections 1169, 1185 *et seq.*, Civil Code and *Miranda* v. *Costa*, 77 P.R.R. 749, 766 (Belaval) (1954). But it is also true, that for the purposes of the existing § 2 of Act No. 229 of 1942, the express, direct, clear and conclusive admission, acceptance, or confession made by the defendant father Andrés Díaz in his answer to the complaint on June 10, 1957 of the fact of his biological paternity of his plaintiff son, operated as a full acknowledgment of the son by voluntary and autonomous action and sufficient in itself at law to generate the paterno-filial relation between both with all the legal consequences derived therefrom, notwithstanding the attempt of the defendant father to subject its nature to his own terms and conditions. From that date on the fundamental fact of the natural paternity, already established in a public document, had ceased to be subject to judicial appreciation, the continuation of the controversy was rendered useless and it was not even necessary that the same be adjudicated by judgment in order to consider that the status had been created.

---

which it is possible to aver with certainty that the acknowledger does not want the normal juridical effects of the acknowledgment (but that he wants for example merely to give the right for support), and it would be untenable to state that such effects *are always produced because they are wanted*, except in the case when they are not wanted, in which they are produced *even though they are not wanted*.

"Hence, the will of the acknowledger is not relevant for basing thereon the effects of the acknowledgment, which are produced *without it* (for example, solemn declaration of paternity exclusively, that is, without the declaration of attributing status) or *against it* (acknowledgment under protest of not wanting to attribute status). And when there exists a will of juridical effects (thus if it is expressly stated that he wants to attribute status) it is perfectly inoperative and the effects are not derived therefrom." (Emphasis in the original.)

On July 11, 1922 the case of *Ex parte Morales*, 30 P.R.R. 848 (Franco Soto) was decided. We considered—notwithstanding appellant's contentions to the contrary—that there exists a great analogy between the situation of facts involved therein and those of the case at bar, except that in the former the provision which permitted the father to acknowledge voluntarily his extramarital child in a public document was § 131 of the Spanish Civil Code and in this case it is § 2 of Act No. 229 of 1942.

In the case of *Ex parte Morales, supra*, Joaquín Morales Flores requested in the former District Court of Humacao that he be declared the sole and universal heir of his father Eduardo Morales who had died intestate. To prove his relationship with the deceased, he presented in evidence a civil case of filiation filed by him and four other children against said Eduardo Morales. From that record it was found proved that "when the alleged father found himself sued, he voluntarily admitted in his answer that Joaquín de la Cruz, the petitioner . . . was begotten by the defendant in that case during his relations with the plaintiff (María Flores, mother of the plaintiff in that case) and that he had acknowledged him as his son by direct acts which implied the continuous possession of the status of natural child, and denied the allegations regarding the other four children . . ." No judgment was rendered in the case because the plaintiff mother abandoned the action. The aforesaid district court dismissed the petition on the ground that the admission made by the defendant father in answering the complaint in that case of filiation that Joaquín Morales Flores was the fruit of his relations with María Flores, *did not constitute a voluntary acknowledgment* of the petitioner as natural son of the defendant father. We overruled the trial court and held that said action did constitute without more a valid voluntary acknowledgment which, the natural father having died, put

the child in a condition to request and obtain a declaration of heirship.

Referring to this case, which appellant insists in distinguishing, the latter admits on page 6 of his brief:

"That is, what said case decides is that once the admission of paternity is established in an Answer in an action of filiation, said admission, because it was made in a public document, such as is an answer in a suit, constitutes an authentic acknowledgment.

"It is precisely in harmony with said doctrine that in the present action we do not deny, but on the contrary maintain, that by virtue of defendant's admission in said answer in the above-entitled case, he admitted indubitably and conclusively that he is plaintiff's father."

In *Velázquez* v. *Velázquez,* 82 P.R.R. 600 (Blanco Lugo) (1962), in fixing the nature and effects of a certain notarial document called "Sale and Material Division of Property" and of another explanatory private document executed by the same parties, we held that they were in themselves sufficient to constitute an acknowledgment of a child by the voluntary action of his father's heirs.

On December 18, 1962 in *Díaz* v. *Heirs of Díaz*, 86 P.R.R. 757 (Belaval), we also held that the fact that a taxpayer states in his income tax returns corresponding to several years that certain persons—born while he was married—were his dependent children, constituted, pursuant to the provisions of Act No. 229 of 1942, as amended, an acknowledgment of the children by voluntary action for all legal purposes.[3]

---

[3] In the opinion of the case we said in part:

"As to the express character of the public document, the rule laid down by the trial court is even stricter than that required by Spanish case law for the indubitable writing pursuant to § 125, for besides the express statement in the private document the incidental—*incidence*—is permitted, it being sufficient that the intention to do so be present, although the document's purpose were another one. We have found such a criterion admirably expressed in the dispositive part

Appellant maintains that in *Correa* v. *Heirs of Pizá*, 64 P.R.R. 938 (Snyder) (1945) and *Alvarez* v. *Alvarez*, 77 P.R.R. 862 (Sifre) (1955), we held that admissions of paternity made in the answer to the complaint in an action of filiation or in the course of a preliminary hearing, do not constitute the acknowledgment by voluntary action provided by § 2 of Act No. 229.

The first impression had upon reading those opinions for the first time tends to tilt the balance in favor of the defendant father. But subsequent and more careful readings supplemented by a full knowledge of the concurring circumstances therein in the light of our records on appeal formed in both cases, inform us clearly: (a) that in *Correa* nothing was decided with respect to the effect, in an action of filiation, of the admission of paternity in an answer to the complaint, and (b) that the *Alvarez* case was erroneously decided and it is not binding on us. Let us be more explicit.

In the *Correa* case, decided May 9, 1945, as we shall hereinafter show, we committed our original sin in making our first contact with the social reform actually commenced in 1942 by virtue of Act No. 229 of that year. We decided there, and for the first time, that the conduct of the father or

of the Judgment of January 22, 1948, of the Supreme Court of Spain which reads as follows: 'Whereas although the fifth *Base* of the Act of May 11, 1888—invoked by appellant in support of his thesis—states that "inquiry into paternity shall not be permitted except in criminal cases or when there exists a writing by the father wherein the indubitable will to acknowledge his paternity is deliberately and purposely expressed or when there is possession of status," the truth is that between this language and that of § 135 of the Civil Code a marked difference is observed under two distinct aspects: the first is that the fifth *Base* uses the generic term "child", while § 135 specifically refers to the "natural child", and the second aspect—the one which concerns us now for the purpose of deciding the question raised—consists in that the fifth *Base* employs the words "deliberately and purposely expressed" referring to the indubitable will to acknowledge, whereas what is required with indubitable character by § 135 is the writing in which the father acknowledges his paternity not the purpose which has inspired such an acknowledgment.' "

his external actions after the approval of said Act No. 229, by virtue of which he admitted his paternity, did not constitute the acknowledgment by voluntary action and that by provision of § 125 of the Civil Code it could only be made if the father did so in the birth certificate, a deed or any other public document. The complaint of filiation was filed on May 15, 1944 against the heirs of Juan Pizá, deceased May 23, 1943. The defendant heirs *did not file an answer to the complaint*, nor in any manner did they admit that their predecessor had been the father of plaintiff therein, born in 1917, while her alleged father was married. The case was decided on the basis of a motion filed by the defendants requesting summary judgment in their favor, on the ground that the condition of adulterous child of plaintiff therein, not acknowledged by public document, precluded her from obtaining her filiation. A copy of the will of Juan Pizá, executed in 1941 wherein he stated that "he has no acknowledged or unacknowledged natural children" was attached to that motion. At the end of the first paragraph of the opinion reference is made to that motion. Of course, the father having died prior to the commencement of the suit and the complaint not having been answered nor the paternity admitted in any way by his heirs, it cannot be averred that in the *Correa* case we decided what appellant alleges. Undoubtedly an error of translation in the last paragraph of the opinion,[3a] the text of which is inserted by appellant in his brief, gave cause for the belief that an answer to the complaint had been filed, as in it we referred to "the acts and statements of the father . . . described in the complaint herein admitting parenthood." Really we were referring to the treatment and behavior which it was alleged the father had observed with respect to his daughter and to

---

[3a] In its original English text it is stated: ". . . it is obvious that the acts and statements of the father subsequent to 1942 described in the complaint herein admitting parenthood are not the 'voluntary action' contemplated by sec. 2."

a promise he had made of acknowledging her shortly before his death, which could be considered as "acts and statements of the father admitting parenthood" later described in the complaint which was never answered, as happened in the case at bar.

The case of *Alvarez* v. *Alvarez, supra,* was commenced in the trial court in December 1951. The plaintiffs were the children of the married father, born between 1922 and 1927. The father had died in January 1951 for which reason his heirs were sued. In their answer the latter denied the paternity, the concubinage and the possession of status of natural children alleged in the complaint. But in the pretrial conference the defendant heirs admitted that plaintiffs were the children of the deceased father and it was left "up to the court to determine on the evidence the classification of such children, whether natural, legitimate or adulterine, whatever appeared from the evidence."

At the beginning of the trial the judge reproduced for the record the entire text of the order of pretrial and with respect to the action of filiation the judge and the defendant heirs stated the following which we take from page 7 of the original record on appeal:

"The Court: Very well. What I meant was that the Court could render judgment, in accordance with the admissions made by the parties, as to the first cause of action, that is, that plaintiffs are the children of Félix Alvarez and of Victoria Alvarez, both deceased; that plaintiffs were born when Félix Alvarez was married to another woman, who is not Victoria Alvarez, that is, that he was married to Obdulia Alvarez; and that plaintiffs having been born under such state of facts, they are entitled to bear the surname of their father in accordance with the prevailing legislation, but they are not entitled, pursuant to law, to be considered as the acknowledged natural children. It means that as to that cause of action there is no contention, after those admissions are made and in view of the allegations of the parties. And thus classified, they have no right to the inheritance.

"Defendants: We agree.

"The Court: That is the law and those are the facts and it is so declared judicially by this court. Let us hear the evidence as to the other causes of action of the complaint."

In its findings of fact as well as in its conclusions of law, the trial judge stated that "the plaintiffs are the children of Félix Alvarez Santana born from his relations with Victoria Alvarez in concubinage and while he was married to Obdulia Alvarez"; that they are the natural children of the deceased, "but for the sole purpose of bearing his surname but not of inheriting from him." He cited as authority the case of *Vargas* v. *Jusino*, 71 P.R.R. 362 (1950).

Judgment was rendered on May 6, 1953 granting the action of filiation, but for the sole purpose of using the surname of the deceased father, denying all right to inheritance.

On appeal we affirmed the judgment on January 28, 1955 while the Constitution and Act No. 17 of August 20, 1952 were in full force.

The first error assigned on appeal by the plaintiff-children (which was supported by interesting arguments which in some points coincide with the ideas stated herein), is as follows:

"FIRST ERROR: The trial court erred in deciding that the plaintiffs-appellants, who had already been acknowledged by voluntary action of their father's heirs (the defendants-appellees) prior to the trial, as children of Félix Alvarez Santana, ratifying the acts of their father, are not natural children but rather adulterous and that as a result they are only entitled to bear the surname of their father, but not to inherit from him; thereby violating the provisions of § 2 of Act No. 229 of May 12, 1942, as amended by Act No. 243 of May 12, 1945, and § 1 of Article II of the Constitution of the Commonwealth of Puerto Rico and in violation of § 22 of the Civil Code of Puerto Rico, 1930 ed."

Notwithstanding the fact that in 1953 the defendant heirs accepted in said case that it be stated in the certificate or order of the pretrial and in the record of the trial—two

public documents—the certain fact and at that time indubitable that their father was also the father of the defendants, we held that such express admissions, freely made and established in two public documents, did not constitute a voluntary acknowledgment pursuant to Act No. 229 of 1942 and that "no reasoning whatever can lead us to the conclusion that that admission has the scope attributed by appellants." (P. 868.)

Undoubtedly, the ruling in that case of *Alvarez* v. *Alvarez*, upon being confronted with our view in the present case, does not constitute a persuasive precedent which in any way helps the cause of appellant.

## II

Did Act No. 229 authorize the implied or tacit acknowledgment? In our opinion it did. It grants to the father, in general terms, the power which it denied before, of acknowledging by voluntary action "children born out of wedlock prior to the date this Act takes effect . . . who lack the qualifications of natural children according to previous legislation." But it did not define the term "voluntary action." It did not prescribe the manner or way in which the father could announce or express the manifestation of will in the acknowledgment, that is, that voluntary action. Of course, among the variety of possible ways there would always be the direct expression of the will in a private document written and signed by him, in testament, in the birth certificate and in any other public document. There would always be the conduct, the treatment, the behavior, all the acts performed by the father with respect to his child and from which paternity could be reasonably inferred, or considered as a tacit confession of paternity, even though it would not fall within the rule of uninterrupted possession of status of child mentioned in § 125, which is, after all, but the legal grade that must be made by the implied acknowledgment within the discretionary powers the courts have to weigh the evidence.

The law took into account the human experience, the realities of life. The different behaviors of man in the face of the different social situations. It refused to frame voluntary action within the impossible formulas which have been traditionally rejected by social demands.

We have already seen that the defendant father in his answer also stated: ". . . Accepts that from the birth of plaintiff he has always furnished him with all his necessities as a son." With this statement Andrés Díaz admitted that since January 26, 1939 until June 10, 1957—for more than 18 years, 15 of which lapsed after the enactment of Act No. 229—he constantly and at all times held Ramón Ocasio as his son and as such he furnished him "with all his necessities." Díaz did not allege that he did so involuntarily, under violence or intimidation, by fear or error, or merely by pitiful devotion to his neighbor.

That prolonged and persistent conduct, behavior, treatment and deportment shown by Andrés Díaz personally towards his son, is what we have always considered as "the uninterrupted possession of the status of natural child of the defendant father."

Appellant consistently cites the case of *Correa* v. *Heirs of Pizá*, 64 P.R.R. 938 (Snyder) (1945).[4] Among other things, we held there:

"When § 2 is read in the light of § 125 of the Code, it is obvious that the acts and statements of the father subsequent to 1942 described in the complaint herein admitting parenthood are not the 'voluntary action' contemplated by § 2. Voluntary action, as § 125 indicates, means execution by the father of a birth certificate, deed, or other public instrument. The allegations of the complaint might well have entitled the plaintiff under § 125 to force her father to recognize her involuntarily as his

---

[4] As we already stated, this case of filiation, of a girl born in 1917 of a married father, was filed in the former District Court of Arecibo on May 15, 1944. The alleged father had died on May 23, 1943. His heirs were sued.

natural child pursuant to a judicial order to that effect, if she had not been an adulterous child. But § 2 of Act No. 229, in providing for possible recognition of adulterous children who, like the plaintiff, were born prior to May 1942, limits this to recognition by voluntary action only, within the meaning of that phrase in § 125 (*Actas del Senado, supra*, Muñoz Morales, *supra*). This requires a recordation, will, or other public instrument by the father. And that did not occur here."

On the basis of an aspect of that doctrine—elimination of the implied acknowledgment—the filiation of Ramón Ocasio which was grounded on those original allegations of the complaint which only stated the acts and conduct of the father after the effective date of Act No. 229, would have failed. But also on the basis of another aspect of that doctrine—voluntary action should be established by public document—the action would have prospered as soon as the defendant filed and joined to the record of the case the answer to the complaint, already a public document, and in which he accepted the existence of his acts and requested the Superior Court to declare him plaintiff's father, although, of course, subject to the terms which he sought to impose on the court and on his own child.

The interpretation of the phrase "voluntary action" departed considerably from the golden rule provided by § 19 of our Civil Code which provides that the most efficient manner of discovering the true meaning of a law when its expressions are doubtful, is to consider the reason and the spirit thereof or the causes which induced the legislative power to enact it. Pursuant to § 15 of the same Code they should have been construed "in their most usual signification" and the general and popular use given to them.

It is true that our Legislature approved, shortly after the decision of *Correa* v. *Heirs of Pizá*, Act No. 243 of May 12, 1945, amending § 2 of Act No. 229 of 1942, for the purposes of granting to the not natural illegitimate child, born prior

to that year, who was not voluntarily acknowledged by his father, an action for his filiation, but limiting it to the purpose of bearing the father's surname.

The content of that amendment of 1945 was construed in *Cruz* v. *Andrini*, 66 P.R.R. 119 (Travieso) (1946), under the influence of the very strict doctrine of *Correa* v. *Heirs of Pizá, supra.* The implied or tacit voluntary acknowledgment permitted by Act No. 229 of 1942 was again declared invalid. It went further: it eliminated once more the uninterrupted possession of status of natural child as a reason to declare judicially the filiation in these cases of adulterous children born prior to 1942.[5]

Neither the case of *Correa* v. *Heirs of Pizá*, nor those considered under its sign, were correctly decided. It is our undeclinable obligation to overrule them as the case law and we do so here.[6] Let us see.

---

[5] The progeny of the case of *Correa* v. *Heirs of Pizá*, although it has not always received the unanimous vote of the Court, is quite abundant. See: *Cruz* v. *Andrini*, 66 P.R.R. 119 (Travieso) (1946); *Fernández* v. *Heirs of Fernández*, 66 P.R.R. 831 (De Jesús) (1947); *Elicier* v. *Heirs of Cautiño*, 70 P.R.R. 407 (Marrero) (1949), dissenting opinion of Mr. Justice Negrón Fernández; *Rossy* v. *Martínez*, 70 P.R.R. 703 (Marrero) (1949), dissenting opinion of Mr. Justice Negrón Fernández; *Vargas* v. *Jusino*, 71 P.R.R. 362 (Marrero) (1950), dissenting opinions of Mr. Justice Todd and Mr. Justice Negrón Fernández; *Armaiz* v. *Santamaría*, 75 P.R.R. 544 (Per Curiam) (1953); *Alvarez* v. *Alvarez*, 77 P.R.R. 862 (Sifre) (1955); *Sánchez* v. *Díaz*, 78 P.R.R. 771 (Pérez Pimentel) (1955), dissenting opinions of Mr. Justice Negrón Fernández and Mr. Justice Belaval; *Márquez* v. *Avilés*, 79 P.R.R. 816 (Per Curiam) (1957), Mr. Justice Negrón Fernández took no part; *Ex parte Vélez*, 81 P.R.R. 634 (Pérez Pimentel) (1960), separate opinion of Mr. Justice Santana Becerra.

[6] Our case law is not static, it must be dynamic, as the laws themselves, which having the character of permanence in their rights, are variable in their progressive evolution, taking into consideration the new necessities and realities of life. In the historic decision of *Giménez et al.* v. *Brenes*, 10 P.R.R. 124, 163 (Figueras) (1906), in which the constitutionality of the summary mortgage foreclosure proceeding was debated, Mr. Justice MacLeary, in his famous dissenting opinion, left the following admonition:
"If it is necessary to modify the opinions of this court heretofore rendered in order to reach a correct decision of this case, by all means let them be modified, or if necessary overruled. Error can never

The Revised Civil Code of 1902 separated the children in two large divisions: legitimate and illegitimate. The latter were the children born out of wedlock, whether or not the parents could intermarry at the time of the conception or the birth. That legal body did not submit to specific forms nor to magic taboos the acknowledgment of such children, as it was imperatively done, and is still done, by § 131 of the Spanish Civil Code.[7] It simply provided:

"Section 187. Illegitimate children *may be recognized in any way* by the father and the mother conjointly, or by either of them."

To decree the judicial acknowledgment it was sufficient, pursuant to § 189, in the absence of a writing of the father acknowledging his paternity, that the father should hold the child as his own, publicly or privately, or that he should have called it such in conversations, or looked after his education and maintenance.

It included all the acknowledged illegitimate children among the forced heirs—§ 795 (2)—and provided that they shall have "the same rights of inheritance as lawful children and their issue." Section 913.

Calderón, Jr., in his excellent annotation *"La Filiación en Puerto Rico,"* in XX *Rev. C. Abo. P.R.* 287–290, No. 4, of August 1960, among other proper comments, made the following:

---

become truth by being persisted in; if the wrong path has been followed let us retrace our steps, before we are lost in the labyrinth of fallacy; let us dare to do right."

[7] That § 131 reads:

"The acknowledgment of a natural child *must be made* in the record of birth, in a will, or in some other public document."

Our Code never adopted that exclusive form of making the acknowledgment. The 1911 edition, in part of its § 193, merely established, with respect to the natural children, the following permissive rule:

"The natural child *may be recognized* by the father . . . in the record of birth or in any other public instrument."

"The third period in the development of the paternofilial relations in Puerto Rico, which commences with the approval of the Revised Civil Code of 1902, accuses a marked deviation from the ancient orientations and it is characterized by an attitude of vanguard, fundamentally liberal. It is perhaps the first expression of what we might call Puerto Rican Law on the problem. In 1902 the Puerto Rican Legislature adopted a new Civil Code, very similar to the Spanish Code in most of it, but particularly different in its provision concerning the Family Law. The First Book of the Code of 1902 radically departs from the previous orders and carries out a true revolution in the treatment of natural filiation. These innovations, repeated in 1942 with slight changes, as we shall hereinafter see, were, undoubtedly, the forerunners, the bases of the system of complete liberality which prevails today in Puerto Rico on this matter. It is true that they were later rejected in 1911 and retreat was made to the traditional system; but the permanent effects produced by the temporary victory attained in defense of the modern tendencies in 1902 should not be underestimated; this victory opened the way to new atmospheres and social exigencies which finally tore down the barrier of tradition and imposed on our society new concepts entirely different from those that had theretofore prevailed.

"· · · · · · · · ·

"Although the Code of 1902 copied at length from the Civil Code of Louisiana, it did not retain, as we have seen, the traditional classification of extramarital children. Muñoz Morales is of the opinion that a civil error was committed in adopting that mutilated text and that this made its amendment necessary in 1911, returning to the old doctrine of the Spanish Civil Code. On our part we believe that the amendments of 1911 were not merely directed to correct errors in the language or order but that they pursued more significant motivations. Frankly, for historico-sociological reasons and because of our religious tradition the people was not prepared to assimilate a change of such vast proportion and it reacted vigorously against that traumatic disadjustment. We shall see that in 1942, on the contrary, the modern tendencies of liberality had paved the way for another similar change and that the juridico-social atmosphere was receptive to said change.

". . . . . . . .

"In 1902 the Revised Civil Code did not contain any provision as to how the voluntary acknowledgment was to be adapted. For this reason Muñoz Morales believes that it could be 'express, implied, direct, or indirect, or in any way,' that is, that it need not be made in the record of birth, in a will, or in any other public document, as it had to be done in the preceding period. We agree."

The child born in marriage, even when the union between its parents has ceased, as a matter of fact, prior to his birth or even when he was conceived prior to the marriage of his parents but born thereafter, has parents and has its filiation secure. But his brother, who was begotten by his father out of wedlock, he is born without parents and, of course, without filiation, before the same law, by the grace of the same legislated right.

From another excellent annotation on the matter of the distinguished professor Mascareñas, published in *Revista de Derecho Puertorriqueño*, No. 4, April–June 1962, p. 14, entitled *"La Filiación en el Derecho Puertorriqueño,"* we take the following paragraph:

"When dealing with extramarital children, the question is treated differently. At the time of their birth they have no specific parents, they have no specific filiation. They shall be illegitimate children if born at one time; natural illegitimate children or not natural illegitimate children if born at another time; natural children all of them if born after the enactment of the Act of May 12, 1942. But in all such cases at the moment of their birth they lack filiation. The parents may appear later or they may not appear at all. They may appear spontaneously, if they voluntarily acknowledge their child, and in such case, they may appear promptly, if they acknowledge the child upon recording his birth, or late in the course of the years. They may appear compulsorily, by virtue of an action brought against them in the courts. And it may happen that they may never acknowledge the child; or because an action is never filed against them, whether merely because the action was never brought or because

the action was brought and the court dismissed it for insufficient evidence.

"Thus, it is easy to realize that the principal problems concerning extramarital filiation would turn on the acknowledgment and the action of filiation.

"Inasmuch as extramarital children, unlike legitimate children, at the time of their birth have no parents, there is no problem concerning the destruction of filiation. The problems consist in *acquiring* the filiation. And thus, we must face the problem of voluntary acknowledgment on the part of the parents and of filing the proper action of filiation (compulsory acknowledgment)."

Notwithstanding the fact that Act No. 229 of 1942 represented an outright revival of the liberal policy of § 187 of 1902, or the return to the acknowledgment "in any way," implied in the very core of the simple phrase "voluntary action," sole condition imposed for the acknowledgment of the adulterous child born prior to 1942, in *Correa* v. *Heirs of Pizá*, we stripped that phrase of every human feeling and significance consistent with its purposes and intentions. We held, in brief, in that case that said law "was passed in the light of our Civil Code, particularly § 125 thereof," and that the phrase "voluntary action" meant "as § 125 indicates (which did not even use the adjective 'voluntary'), the execution by the father of a birth certificate, deed, or other public instrument," and that any action of filiation under Act No. 229 would have to be based on paragraph 2 of § 125 of the Civil Code, 1930 ed. In other words, we gave effectiveness to § 131 of the Spanish Code.

Against the doctrine of *Correa* v. *Heirs of Pizá*, Mr. Justice Negrón Fernández, today our Chief Justice, rendered a reasoned opinion in *Elicier* v. *Heirs of Cautiño, supra,* in which he stated in part:

"I think that the doctrine laid down in *Correa* v. *Heirs of Pizá, supra,* and followed in *Cruz* v. *Andrini,* 66 P.R.R. 119, and *Fernández* v. *Heirs of Fernández,* 66 P.R.R. 831, should

be overruled and a new construction and scope given to the phrase *by voluntary action* to the effect that under subdivisions 1 and 2 of paragraph 3 of § 125 of the Civil Code, 1930 ed. which establish, respectively, that the father is obliged to recognize the natural child (1) when there exists an indubitable statement in writing of the father wherein he expressly acknowledges his paternity and (2) when the child has uninterruptedly enjoyed the condition of a natural child of the defendant father justified by acts of the same father or of his family, the recognition resulting from an action brought by the child thereunder is by *voluntary action,* within the scope and purpose of § 2 above mentioned.

"In the decision in *Correa* v. *Heirs of Pizá* this Court gave a restrictive construction to Act No. 229. By holding that the phrase *voluntary action* means the execution by the father of a birth certificate, deed or any other public instrument, as provided in paragraph 2 of § 125 of the Civil Code, it included in § 2 of Act No. 229 a limitation not contained therein. In so doing it lost view of the unquestionable and true fact that under the first two subdivisions of the third paragraph of § 125, —indubitable written statement and possession of the status— the acts of the father, to entitle the natural child to bring a judicial action for his recognition, must be, and actually and in law are, so voluntary and spontaneous as those that for the recognition under the second paragraph of said Section may be made by the father in a birth certificate or in a public instrument.

"The phrase *voluntary recognition* is not covered by § 125. Recognition in a birth certificate or public instrument has been so characterized because in the second paragraph of this Section it is provided that 'The natural child *may be recognized* by the father and mother conjointly or by one of them only either in the record of birth or in the testament or in any other public instrument.'

". . . . . . . .

"The lack of solemnity in the recognition by indubitable written statement and possession of status does not affect, and does not prejudice, in any way the voluntary and spontaneous character of the previous acts of recognition that is subsequently ratified by the court in a declaratory judgment. By such ratifi-

cation only the lack of solemnity of said acts is supplied but not their voluntary and spontaneous character, which is an indispensable requisite for the ratification. In the absence of any indication in § 2 of Act 229 to limit the scope of the term 'voluntary action' used therein to indicate the cases in which the children born prior to its effective date and who lacked the condition of natural children pursuant to prior legislation, may be acknowledged by their parents—or by the persons entitled to the inheritance—said Act should be construed in a liberal, not restrictive manner and not in the light of the caption given to the *forms* of acknowledgment contained in § 125 of the Civil Code, but rather in the light of the voluntary condition of the previous acts, which determine the recognition and give rise to the right that said recognition be declared in accordance with the commentators and the decisions of the Supreme Court of Spain, so frequently cited in the study of our Civil Code that they have become a part, by adoption, of our legal system; and if in our previous decisions we did not fathom the 'voluntary' condition of the previous acts of recognition contemplated by subdivisions 1 and 2 of the third paragraph of § 125, it is imperative, in construing a statute so important socially as Act No. 229, that we go to the roots of § 125 of the Civil Code to measure, in all the extent of the social justice which it pursues, the legislative action in enacting Act No. 229. 'The decisions cannot remain extraneous to the functions of public law and the influence of the social environment'—Judgment of the Supreme Court of Spain of November 21, 1934, 216 *Jurisprudencia Civil* 91 . . ."

Under the authority of the doctrine of *Correa* v. *Heirs of Pizá*, we continued to uphold and affirm on appeal judgments rendered in actions of filiation which had been brought pursuant to Act No. 229 of 1942, as amended in 1945, and which denied any declaration of status because the evidence was not sufficient to consider the voluntary action as included among the cases contemplated by § 125 of the Civil Code.

In *Miranda* v. *Costa*, 77 P.R.R. 749 (1954), decided by judgment of December 30, 1954, without opinion—two and

a half years after the Constitution went into effect—we did so by majority. But following the bare judgment rendered in that case, there is a brilliant dissent by our brother Mr. Justice Belaval. We reproduce here the following paragraph:

"However, at the time of passing judgment the trial judge did not have the benefit of an ample discussion of the 'strong and convincing evidence' rule announced in our decision in *Figueroa* v. *Díaz*, 75 P.R.R. 152, 163, 173, 178, 179, 180, 181, 185 (Negrón Fernández, Ortiz, Marrero, Sifre) (1953), in which it was held that, 'There is nothing in the act requiring a specific "quantum" or type of evidence to justify the compliance with said requirements,' and therefore, filiation suits must be decided in accordance 'with the authentic preponderance of the evidence.' The need for the new rule was evident. In enacting §§ 189 of the Code of 1902, 193 of the Code of 1911, and 125 of the Code of 1930, the lawmaker had in mind an illicit sexual relation between an unmarried male and an unmarried female, where greater inquiry into paternity is possible. In enacting Act No. 229 of May 12, 1942 and Act No. 243 of May 12, 1945, the lawmaker had in mind an illicit sexual relation between a married male and an unmarried female, or a married female and an unmarried male, or a married male and a female married to another man, who were not intermarried. While in the case of natural descent of unmarried male and female the indubitable statement in writing may be express, open, and deliberate, since there is no conflict with any other legitimate descent, in the case of an adulterine descent of a married male or female the indubitable statement may be less precise, more cautious, more contradictory. While in the case of natural descent of an unmarried male and female the possession of the status of a natural child may be uninterrupted and public, since there is no conflict with any other marital status, in the case of adulterine descent of a married male or female the possession of the status of a natural child may be interrupted, less public, more circumstantial. While in the case of natural descent of an unmarried male and female the state of concubinage may be public and evident, since there is no conflict with the legitimate conjugal relations, in the case of adulterine descent of a married male or female the state of

concubinage may be surrounded by greater secrecy and prudence. While in the case of natural descent of a single male and female the sexual relation from which paternity may be inferred may be manifest and spontaneous, since there is no conflict with a family's social interest, in the case of adulterine descent of a married male or female the sexual relation from which the paternity may be inferred may be surrounded by an atmosphere of moral secrecy and mortification. For this reason, the previous jurisprudence of this Court on § 125 up to 1942, which dealt with the acknowledgment of natural children of unmarried parents was without basis for strict application in connection with everything concerning the acknowledgment of adulterine children of a married male or female. Hence, two members of this Court, Mr. Justice Negrón Fernández and the writer, have maintained the criterion that inquiry into adulterine paternity must not be made within the scope of the traditional naturality provided in § 125 for unmarried males and females, but within a generic civil action wherein the sexual relations at the time of conception are the essential fact for the purpose of establishing the paternity."

In *Armaiz* v. *Santamaría*, 75 P.R.R. 544 (Per Curiam) (1953) and *Vargas* v. *Jusino*, 71 P.R.R. 362 (Marrero, Todd Jr., Negrón Fernández and Belaval) (1950), actions of filiation filed under Act No. 229 and its amendment of 1945, for the sole purpose of using the surname, we decided by a majority that the mere proof of paternity, without any evidence of any of the requirements provided by § 125, was not sufficient to establish the acknowledgment authorized by said Act No. 229. In the former case, with the concurrence of Mr. Justice Belaval, Mr. Justice Negrón Fernández, today the Chief Justice, produces one of the best conceived dissenting opinions in our case law on the matter of filiation. Its full text reads as follows:

"The rule sanctioned in *Vargas* v. *Jusino*, 71 P.R.R. 362, depriving a child born under Act No. 229 of May 12, 1942 (Sess. Laws, p. 1296), as amended by Act No. 243 of May 12, 1945 (Sess. Laws, p. 814), of the right to bear its father's

surname, notwithstanding the fact that the paternity was fully established thus creating legal obligations in the father, should prevail no longer in our jurisprudence.

"That same rule once more deprives another child, whose paternity has been established and whose father has been adjudged as such, of its right to bear a name.

"Yesterday it was Claribel Vargas—in all fairness Claribel Jusino—who sacrificed her right to bear the paternal surname because all she could prove was who her father was. Today it is Liliana Armáiz—in all fairness Liliana Santamaría—who sacrifices the least right recognized to her by our positive legislation, because the only evidence she was able to offer was a previous judicial declaration of paternity. As if paternity, as a juridical truth, could be re-litigated after having been judicially sanctioned. As if paternity were not a single unit, which, after being adjudicated, would not create, as a consequence inherent in its own existence, the right to a name, which is the first distinction of dignity conferred on every human being.

"Commenting on the 'prohibitive silence' of the Spanish Civil Code on the right of adulterine and incestuous children to bear the father's surname—a legal right whose purpose of social justice has been changed by Act No. 229—Scaevola states as follows:

" 'The Code is silent on one of the rights which it grants other children, such as the right to bear the surname of the father or mother making the acknowledgment. Will the illegitimate child, who is not natural, have such a right when he receives support, upon meeting any of the circumstances enumerated in § 140? Section 139 provides that the legitimate, legitimized and natural children shall be entitled only to support, omitting the case under consideration here, expressly mentioned in the Code, the inference being, therefore, that the fundamental civil law grants them no such right. However, every individual must, from the instant of his birth, carry a surname . . . We can in no wise agree with the prohibitive silence of the Code, springing from the use of the adverb *only*. Parenthood bears, and has always borne, as an inherent consequence, that the children shall use their parents' surname. This is evidenced by the fact that the substantive law in force has not contained hereto-

fore any express provision on the matter. It would therefore be desirable if the authorities should interpret the silence of the law to mean that a child may bear the paternal or maternal surname, in order to achieve harmony with the principles of justice. Once the parenthood, that is, the cause, is legally established, it is necessary to admit the effect, the filiation, and this is accredited in society by the use of the surname.' 3 Scaevola, *Código Civil*, 5th ed., 437–438.

"Justice, in the purest concept of its mission, has a social function to accomplish and a human objective to achieve. The restrictive interpretation of Act No. 229, which is repugnant to the purpose of social justice which inspired it, and which negatives a right which stems from a legally verified filial relation, does not accomplish that function or achieve that objective. Under that legislation, there will be no more children without name—true outcasts in our community—whenever they have fathers adjudged as such by the State, who are bound to comply with the specific obligations arising from that status. Paternity has no stages, nor classes, nor degrees. Act No. 229 does not require, cannot require, proof other than paternity. *Vargas v. Jusino, supra*, dis. op., p. 369, *Figueroa v. Díaz, ante*, p. 152, the writer's opinion. I therefore dissent."

In his opinion in *Figueroa v. Díaz*, 75 P.R.R. 152–168 (1953), he had already shown to satiety that the rules of the Civil Code, particularly those contained in its § 125, were not suitable to give full force to the reform imposed by Act No. 229 of 1942. We quote therefrom (pp. 163–165):

"A juridical anachronism results when the judicial power denies consequences to, and renders void in its essential purpose of real equality—in its deep sense of human dignity—a precept of substantive law, because of the fact that the legislative power did not expressly provide for a means to manifest said equality. But the right to paternity should not depend on the degree of skill employed in drafting a statute. Once its purpose is known as well as the philosophy inspiring it, we should make effective its fundamental purpose. Equality does not allow for discrimination nor authorizes privileges. There can be no real equality between natural children and adulterine or incestuous children as long as the latter are submitted to the severity of an ac-

knowledgment based on an *uninterrupted possession* of status and on *concubinage,* because in real life, under the established social order, those statuses if produced, are not consolidated, and if consolidated are not openly manifested so that the adulterine or incestuous children may derive benefit therefrom, the requirement of said proof actually constituting a denial of the right granted by Act No. 229 to investigate their origin.

"Our generation has the duty of eradicating traditions and precedents which are archaic in our age because they are not up to the actual state of our collective conscience nor are they up to the progressive development of our judicial philosophy. The right of adulterine or incestuous children to filiation under Act No. 229 should be predicated on the investigation of paternity through any legitimate means of proof as said Act naturally implies; but never on public admissions of paternity, as required in the possession of status, or in public relations of adultery, which as regards the children, is required to prove concubinage.

"The *sense of injustice* which sometimes disturbs the conscience in its search for truth and which as an active, spontaneous source of law contributes its current to the juridic stream, makes a practical working difference in courts upon becoming an adequate criterion to reach a true *sense of justice* in the judicial controversies. Cahn, The Sense of Injustice, 11, 31. It would not be fair to deprive an adulterine or incestuous child from his filiation under Act No. 229, because he is not able to prove judicially the improbable fact that his father *confessed* or publicly *admitted* his paternity or publicly proclaimed his crime. Laws are made by men and are construed for men. Therefore, in their interpretation, the reality of human life must predominate and not the dogmatic abstraction of eternal and invariable rules and much less the standards of social discrimination already repudiated by the fundamental law of the state even if prospectively. See, Max Radin, Law of Logic and Experience, p. VIII, 46, 160 *et seq.*; Cardozo, Growth of the Law, pp. 87 *et seq.*; and The Paradoxes of Legal Science, p. 31 *et seq.*; Pound, Contemporary Juristic Theory, pp. 11, 17 *et seq.*; Garlan, Legal Realism and Justice, p. 13 *et seq.* In this age of social justice we must march towards the humanization of justice and of law, leaving behind in its rigorous decadence the dogmatic sense of law and of justice.

"The scope of Act No. 229 must be fixed in order to give viability to the essential purpose of the legislator, placing emphasis in the social welfare as conceived by *'the social sense of justice* . . . imminent in the common mind,' since 'Perhaps the most significant advance in the modern science of law is the change from the analytical to the functional attitude. The emphasis has changed from the content of the precept and the existence of the remedy to the effect of the precept in action and the availability and efficiency of the remedy to attain the ends for which the precept was devised,' Cardozo, The Nature of Judicial Process, p. 72 *et seq.,* and having in mind that 'A thing which is within the spirit of a statute is within the statute, although not within the letter; and the thing within the letter is not within the statute, unless within the intention.' *In re Lambrecht* (Mich.) 100 N.W. 606; *Common Council* v. *Rush* (Mich.) 46 N.W. 951; cf. § 19, Civil Code, 1930 ed. In so doing we would not be legislating, we would not be even traveling beyond the walls of the 'interstices,' Cardozo, *op. cit.,* pp. 98, 113 *et seq."*

In view of the disadvantageous position created by § 125 for the children favored by Acts Nos. 229 of 1942 and 243 of 1945, it was logical to adopt, the latter upon failing to contain specific requirements of proof, the simple rule of proof of paternity.[8]

But because of the principle of equality before the law and in the juridical treatment, that simple rule of proof should benefit also the natural children in the concept of the legislation prior to Act No. 229 of 1942. The mind cannot conceive that the unacknowledged adulterous child, born before or after August 10, 1942, may obtain its filiation by merely complying with the simple rule of proof of paternity without having to go through the embarrassing provisions of

---

[8] In cases of claim for support filed by illegitimate children who were not natural, we had already decided under § 128 of the Civil Code that proof of paternity was sufficient to grant the support. *Cf. Vargas* v. *Jusino,* 71 P.R.R. 362 (1950); *Cerra* v. *District Court,* 67 P.R.R. 872 (1947); *Falcón* v. *Cruz,* 67 P.R.R. 496 (1947) and *Rivera* v. *Cardona,* 56 P.R.R. 786 (1940).

§ 125, while the natural child born prior to that date is compelled, for the same purpose, to comply strictly with the stern rules of proof imposed by said section.[9]

## III

At the time of the judgment—June 5, 1958—did the trial court have power to limit the effects of filiation? Does this Supreme Court have such power or has it ever had it since July 25, 1952? This question requires that we treat the filiatory problem in the light of our Constitution of July 25, 1952 and of Act No. 17 of August 20, 1952.

The Preamble reads in part: "We, the people of Puerto Rico, in order to organize ourselves . . . on a fully democratic basis, to promote the general welfare and to secure *ourselves and our posterity the complete enjoyment of human rights,* . . . ordain . . . this Constitution . . . In so doing, we declare: . . . the political order is subordinate to the rights of man, . . . We consider as determining factors in our life . . . our faith in justice . . . our fidelity to *individual human values above and beyond social position, racial differences, and economic interests*; and our hope for *a better world based on these principles.*" (Italics ours.)

Article II thereof consists of the Bill of Rights. It refers in the first place to human equality. It is conceived thus:

---

[9] In his aforesaid annotation, p. 47, Mascareñas says:

"Whatever the case may be, the same rules should apply in every case to all natural children (in the concept of the Act of 1942). If the determination of paternity, in any way, is sufficient for the adulterous or incestuous children, it should likewise be sufficient for the other natural children, for if, in that event, the latter's opportunity is restricted by the requirements of § 125, then a more favorable situation would arise for the adulterous and incestuous children, which would not be fair, and furthermore, the equality sought by the legislative reform would cease to exist. . . . It may be averred that the requirements of the Civil Code are not suitable for the Act of 1942, and are not in harmony with the spirit of the Act."

"1. [Human dignity and equality; discrimination prohibited]

"The dignity of the human being is inviolable. *All men are equal before the law. No discrimination shall be made on account of race, color, sex, birth, social origin or condition,* or political or religious ideas. Both the laws and the system of public education shall embody these principles of *essential human equality.*" (Italics ours.)

Section 5 of said Art. II provides that "every person has the right . . . to the strengthening of respect for human rights," and, section 7, that "no person in Puerto Rico shall be denied the equal protection of the laws."

The Committee on the Constitutional Convention in charge of studying the Bill of Rights, in its report stated, insofar as pertinent:

"Birth. It is intended to eliminate the juridical stigma against children born out of wedlock. *All children are guaranteed equal rights with respect to their parents and with respect to the juridical order.* Illicit relations may and should be forbidden and this provision shall tend to discourage them. But the innocent offspring should come to the world free of juridical disqualification inferiorities. It is thus required by the principle of individual responsibility, pursuant to which no one is to blame for the acts which he himself did not perform. Although the present legislation already embraces most of the provisions herein set forth, new laws must be enacted. For the purposes of inheritance and property, the changes resulting from this section *shall not be retroactive to births occurring prior to its effectiveness.*" (Italics ours.)

On August 20, 1952 the Legislature approved, with retroactive effect to July 25, 1952, Act No. 17, the title of which reads: "An Act to establish the equality of rights of children." Section 1 provides:

"*All children have, with respect to their parents and to the estate left* by the latter *the same rights that correspond to legitimate children.*" (Italics ours.)

With these twenty-four simple words the Puerto Rican legislator restored in 1952 to a great portion of its people the essential human equality granted half a century before by the Revised Civil Code of 1902—§§ 21, 187–199, 794–796 and 913—but which had been taken away by the codified discrimination of March 9, 1911. That Constitution and this statute which in part implements it, were conceived and approved with the clear purpose and intent of guaranteeing *to us and our posterity the full enjoyment of the rights*, the dignity and equality of the human being and the fidelity to their values above any social position, racial difference or economic interest.

"Us" also includes those who on Monday August 27, 1951 took part in the election of the delegates to the Constitutional Convention, conferring to the latter the "mandate" to adopt that Constitution and who in order to vote in that election must have been born prior to August 27, 1930. Undoubtedly, many of them came from the nineteenth century. Taking under its protective wing all those who lived at the moment of its adoption and in its posterity, the Constitution and Act No. 17 of August 1952 showered on each Puerto Rican alike the blessing of all its postulates, without restriction to the date of their birth nor their social position or economic interest. They did not establish any distinction between the human being who is born under its sign and he who was born prior to 1890, within the system of the Laws of Toro; nor he who was born between January 1, 1890 and June 30, 1902, the system of the Spanish Civil Code; nor he who was born between July 1, 1902 and March 8, 1911, the Christian period of human dignity and equality before the law for all children; nor he who was born between March 9, 1911 and August 9, 1942, medieval period of the stigma, of juridical inferiority and disgrace for some and privileges and advantages for others; nor he who was born between August 10, 1942 and July 25, 1952, the period of progressive legislative

evolution to the complete juridical emancipation that was reached at the latter date.

Ipso jure they declared void and without any force or validity, thenceforth any provision of our legislated right, whether substantive or adjective, which might in any way oppose them. They repealed any law or part of law which in one way or another established or might establish classes or categories of children by reason of their birth or which might use those classes or categories as a guide or index to grant rights.

If they made no distinction, we are helpless to do so. We should not get lost in the labyrinth of unjust distinctions. In the interpretation and application thereof, the basic postulate or human equality before the law should be our guiding star in the most honest, but also the most ungrateful, task of man: to do justice unto others. Equality for the aged and for the young in participating in the enjoyment of every substantive right; equality for all in the juridical treatment before the adjective law in every process of social or patrimonial revendication.

We know that absolute retroactivity of the positive law would be the mortal blow to juridical security and confidence; but we also know that absolute irretroactivity would be the mortal blow to the evolution of the law. Respect to vested rights, to consummated facts, to existing situations, is not contrary to the establishment of constitutional social reforms nor to laws made in view of past situations. Modern tendency, in the doctrine as well as in the legislation, consists in limiting as far as possible the principle of irretroactivity, except in matters of contracts, which in many countries, such as Germany, is nevertheless maintained in all its purity. Here this tendency is embodied in § 3 of our Civil Code, in providing that the laws shall not have retroactive effect, *unless they so decree.* For a long time now we have recognized the retroactivity of the procedural civil law, of laws

which regulate or modify the jurisdiction and venue of the courts and of the criminal statutes insofar as they favor the defendants and improve their conditions.

Our Constitution did not reproduce in its text the aforesaid § 3 of the Civil Code, but it included a concept related to the principle of retroactivity when it established in § 7 of Art. II the following prohibitions concerning matter of contracts: "No laws impairing the obligation of contracts shall be enacted."

Commenting § 3 of the Spanish Civil Code[9a] Manresa says—Vol. 1, p. 162, 7th ed. 1956:

"Although the section we are commenting on seems very simple, at first blush, a little meditation on its application would give rise to a number of doubts which should be decided in the part relative to the civil law, which is where greater difficulties are offered upon examining the transitory provisions for the application of this Code.

"Section 3 of the Civil Code may be considered superfluous if it meant to be a programatic rule addressed to the lawmaker, because it does not concern a constitutional provision and, even less, a strict one; and, it may not be considered, like none of the sections of the preliminary title, of a superior hierarchy to any subsequent law; on the other hand, if it were, the final exception 'unless they expressly so decree' would make the mandate entirely futile. If it is merely a rule—as it must be admitted—given to the trial judge, its scope is none other than that of a rule of construction; and since the final exception contained therein determines that the retroactive effect, or the opposite, should be inferred from the very context of the law to be applied, if it is admitted—as it should be—that the retroactivity may be impliedly established, it will happen that the same conclusion would always be reached by merely using the general rules of construction of law, even if said section did not exist. As to the character that should be attached to the rule of irretroactivity, Gierke maintains that it is a pro-

---

[9a] Which deals with the retroactivity of the law and which is the antecedent of our § 3.

hibitive rule, addressed to the subject of the juridical production; but Ferrara denies that it constitutes a legislative limit."

Since the case of *Charres* v. *Arroyo*, 16 P.R.R. 777, 782 (J. C. Hernández) (1910), we have decided that the right of a natural child to be acknowledged was regulated by the law existing at the time of his birth, because the facts that are supposed to determine the acknowledgment took place under the system of that law. But we have never decided that that doctrine operates as an unsurmountable constitutional limitation to the legislative power to substitute or modify the preceding legislation.

Mascareñas says, on pp. 14–15 of his aforesaid annotation:

"Applicable legislation:

"The Supreme Court has repeatedly declared that the rights of filiation of illegitimate children should be regulated by the legislation prevailing at the time of their birth.

"This doctrine is based on Rule 1 of the transitory provisions: 'The rights originating under the legislation previous to the Revised Code from acts which took place while it was in force, shall be governed by the previous legislation even though the said Code regulates them in a different manner or does not recognize them. But if the rights shall appear and be declared for the first time in the Revised Civil Code it shall have a prospective effect, even though the act which produces it shall take place under the previous legislation. Provided that it be not in conflict with or prejudicial to another right born or acquired through the operation of the said previous legislation.'

"Furthermore, it must be borne in mind that subsequent legislation may vary the situation. And thus, it may be seen, for example, how the Act of May 12, 1942 provides that all extramarital children born prior thereto and whose acknowledgment was impossible may be acknowledged and even legitimated by the subsequent marriage of the parents.

"The principle that the situation of the children and their rights must be regulated by the situation in force at the time they were born, is a principle derived from the positive law

and which does not preclude the legislature from enacting provisions on the matter, modifying rights and obligations, as it does by the aforesaid Act of May 12, 1942 and by others.

"But this is not the case of a 'taboo', untouchable principle, and therefore the legislature may legislate peacefully, modifying the legislation prevailing at the time of the birth."

The legislation of the decade preceding the Constitution, in its substantive aspect, recognized the rights of the legitimate children, of the legitimated, of the acknowledged illegitimate, and of the adoptee, irrespective of the date of their birth. Sections 118, 121, 127, 132, 736(1) and 902, Civil Code. The full enjoyment of these rights was denied only to the illegitimate children, born prior to August 10, 1942, who had not been acknowledged by their father or by the latter's heirs in the record of birth, in a will or in any other public document.

In its procedural aspect, the rules of proof imposed by § 125 of the Civil Code still prevailed—with the degree of quasi-substantive requirements. When the Constitution was adopted and Act No. 17 was approved, those rules became unsuitable to implement the new equality system, they then lost their validity and application with respect to suits and proceedings in filiation pending on July 25, 1952, and those that might be commenced on or after that date.

Since that date, it would only be necessary, for the judicial declaration of the status of child for all legal purposes— the only one allowed by the Constitution and by Act No. 17— if it were not admitted in the answer or in any other allegation, or in any way and at any moment of the suit by the defendant father, or in his default, by his heirs, to sufficiently establish the fact of the natural or biological paternity, by the ordinary and usual rules of proof, the trial judge being called upon to decide the case on the preponderance of the evidence and based on findings which represent the most

rational, juridical and fair balance for the determination of the case.

In *Pabón* v. *Morales*, 79 P.R.R. 146 (1956), a per curiam decision of April 30, 1956—filiation case of a child born on July 22, 1953—we held that § 125 of the Civil Code is not applicable and that the declaration of status of son was proper even though "there never existed a state of concubinage between the plaintiff and the defendant, nor was the uninterrupted possession of the status of natural child proved . . . ."

Another consequence or result of Act No. 17 was the partial repeal of the second paragraph of § 2 of Act No. 229 of 1942, as the same was added by Act No. 243 of 1945, the text of which we repeat:

"In case the children referred to in this section are not recognized by the voluntary action of their parents, and in default of the latter, by that of the persons having the right to inherit therefrom said children shall be considered as natural children for the sole purpose of bearing the surname of their parents. The action for this recognition shall be prosecuted in accordance with the procedure fixed by this title for the recognition of natural children; *It being understood, however,* That such a recognition shall only have the scope herein expressed."

Any statutory provision and any judgment, decree, or judicial decision which in contravention to the letter of Act No. 17 merely grants, recognizes or concedes to the status of child of a human being only part of the unitarian rights which are fully enjoyed by the legitimate child is invalid. Because such rights are inherent to and inseparable from the status of children, because they flow ipso jure from that condition, and because there does not exist since July 25, 1952 any human being who may be considered a child "for the sole purpose of bearing the surname of its parents," and no action or judgment which may have the unique scope of requesting or granting only "the surname of its parents,"

it is obvious that the paragraph copied above as to the consequences and effects to which it refers has been repealed. If the fact of paternity is declared to have been satisfactorily proved, the status of child should be acknowledged for all legal purposes, that is, with the same rights as those of the legitimate child, without any exception or limitation whatever.[10]

In *Matías* v. *Rodríguez*, 79 P.R.R. 14, 17 (Pérez Pimentel) (1956)—the case of a daughter who was born in 1953—we modified the judgment of filiation limited to the use of the paternal surname, making it valid for all legal purposes. After referring to § 1 of Art. II of the Constitution and of inserting the text of § 1 of Act No. 17, we said:

---

[10] Also as a sequel of Act No. 229, a peculiar situation with respect to the categorical declarations of §§ 112 and 113 of our Civil Code was created to the effect that those born after marriage and those born prior to three hundred days following the dissolution thereof are legitimate children. Up to August 10, 1952, when a child was born from a married woman and an unmarried man, the barrier of adultery prevented the natural father from acknowledging him before the law. Of course, there was nothing to preclude the father, as a matter of fact, from accepting that he begot an adulterous child. The husband, by the grace of §§ 112 and 113—to protect the child and marital fidelity—without the sexual cells of his wife having been merged with his male gametes, became the legitimate father of the child of another. It resulted in a sort of juridical male parthenogenesis.

After the effectiveness of Act No. 229 that presumption of legitimacy was left, if not weakened, at least at par with the right granted by that law to the natural father to acknowledge as his son the fruit of his adulterine union, notwithstanding the conclusive provisions of §§ 112 and 113. The situation created, in our opinion, is that of two persons, one considered the juridical father and the other the natural, biological, real and true father, to whom the law grants, simultaneously, the right to record him as his child.

The one who recorded him first as his own child in the Registry of Vital Statistics and who assumed the serious and burdensome paterno-filial responsibilities, should prevail as the father of that child, particularly at a time such as the present one in which for the juridical father he is simply a son, and for the natural father he is also simply a son. It would be incumbent on the one who did not record him as his son, to challenge before the courts the validity of the registration.

"In view of these legal provisions, the judgment which declares the plaintiff minor to be the daughter of the defendant cannot curtail the rights vested in her by law by virtue of such declaration. Any limitation of those rights is invalid, since such rights emerge from her condition as daughter and are an integral part of the judgment. It is our duty, therefore, to modify the judgment appealed from in order to conform it to law."

The most discussed effect of Act No. 17 has been the one relating to the right of inheritance with respect to the adulterous child, born prior to August 10, 1942, and who was not recognized by his father and had to appeal to the courts to obtain the declaration of status of child. We know that the right of inheritance is not considered constitutional. This point, from *Correa* v. *Heirs of Pizá, supra,* to *Márquez* v. *Avilés,* 79 P.R.R. 816 (Per Curiam) (1957), 252 F.2d 715, has been decided in the negative by this Court, relying, not on the constitutional provisions, nor on the clear letter and obvious purpose of Act No. 17 (which was said to have prospective and not retroactive effects), but on the interpretation of a recommendation made in about eleven words of a report submitted by one of the several committees of the Constitutional Convention. Our brief expression in that sense has been more or less thus:

"In the Report of the Bill of Rights Committee and in the debates of the Constitutional Convention it was made clear beyond any doubt that 'for the purposes of inheritance and property, the changes resulting from this section (referring to the aforesaid Sec. 1 of the Bill of Rights) *shall not be retroactive to births occurring prior to its effectiveness.*'"

In our opinion the term "births" was not the correct term. The term that should have been used was "deaths" since it referred to inheritances. We shall explain ourselves.

That Committee could not have advised the Convention that equality in the right to participate in the inheritance of the father, should be granted to persons born after July 25,

1952 and not to those born prior to that date, that is, to take the date of birth as the controlling juridical ground for the inheritance equality. The reason is simple: In our system of succession the right of inheritance originates or arises, not when the individual is born, but at the time of the death of his predecessor. Sections 599, 600, 601, 602, 603, and 610 of the Civil Code. The effect of birth is the determination of the juridical personality and capacity of the individual, § 24 id. Except in the case of a posthumous child, the title of heir is not acquired simultaneously with the fact of birth. The indispensable premise for the acquisition of hereditary rights or its legal cause is the death of the predecessor; without it there is no one to succeed. Birth grants a generic capacity to succeed some time in the future. The phenomenon of hereditary subrogation takes place at the time of the deaths, and not at the time of the births. For that reason we have repeatedly held that the statute existing at the time of the predecessor's death is the one which determines the acquisition of the hereditary right in the succession whose properties shall be divided. See the cases cited on this matter in *Ex parte Orona*, 87 P.R.R. 800 (Santana Becerra) (1963),[11] and in *Berdecía* v. *Superior Court*, 87 P.R.R. 100 (Blanco Lugo) (1963).

While the father is alive, there can be no heirs of fact nor of law. With respect to the future inheritance, the son

---

[11] Among other things we said in that case:

"Not only by reason of the legal technicalities, since no matter how many possibilities and expectations an individual may have to inherit, his right does not take shape or become a reality until the very moment death takes place; but also, and what is still more important, if it is borne in mind that in the right to succeed there are involved basic considerations of public policy of the State, a public policy which may have to be altered in the light of the several economic and social states in the course of the different times. To bind the right to succeed to the existing law at the time of a person's birth would be tantamount to limiting the powers of the State as to its function of determining its public policy in the course of a prolonged period of time such as may be that of the natural life."

is in a juridical situation of expectancy, with an eventual patrimonial right. He merely has the hope to inherit. But, as professor Iglesias Cubría says in his work *"Los Derechos Patrimoniales Eventuales"*, p. 15, Oviedo, 1961: "The mere hopes do not vest title of juridical nature; that is, they are irrelevant to the Law."

The transfer of property from the deceased to the heir cannot be made at times, for example, when the son has predeceased his father, when the latter has disinherited him, when it is disgraceful to inherit pursuant to law, when the whole estate of the deceased is adjudicated to the creditors, when the son never accepted the inheritance, when no assets or liabilities are left at the death of the father.

Moreover, the heir does not actually acquire individually and exclusively the property which belongs to him until the partition is legally made. Section 1021, Idem.

In the light of this basic consideration of the right of succession, it was not proper to use the term "births." The correct and unequivocal thing to do was to recommend that the changes resulting from § 1 of the Bill of Rights should not be retroactive to the *deaths* occurring prior to its effectiveness.

The delegates did not even follow the suggestion made in the report, upon adopting the Constitution. They did not provide therein that a son born prior to July 25, 1952 could not inherit, or could not enjoy equality in the inheritance. When Act No. 17 was approved providing that *all* children with respect to their parents and with respect to the property left by the latter shall have the same right that correspond to the legitimate children, it was made retroactive July 25, 1952, that is, to open inheritances on or after that date, but not to those arising from deaths previously occurring. In including "all the children" as subject to that legal equality it referred to all the children alive on July 25, 1952 with

capacity to inherit and whose fathers should die after the effectiveness of that Act.

The legislative history of Act No. 17 definitively shows that the hereditary right would not be recognized—as it never was—on the basis of the date of the birth of the heir.

From the interesting exposition contained in the opinion of the case *Ex parte Orona*, we reproduce the following paragraphs:

"To the special session of the Legislative Assembly which commenced July 28, 1952, the Governor sent a proclamation dated July 31, submitting the matters to be considered, among them, 'Legislation implementing Section 1 of Article II of the Constitution of the Commonwealth of Puerto Rico, eliminating discrimination by reason of birth.' The matter became Senate Bill No. 18, which was reported favorably to the Senate by the Juridical Civil Committee, and was drafted in the manner provided in Act No. 17. It was approved by the Senate and passed to the House. Upon being informed by the Secretary, the Vice-President, Hon. Benjamín Ortiz, stated the following:

" 'The problem we had encountered as to this legislation referred to the following: Under the Constitution, as you well know, all discrimination is eliminated by reason of birth; that is, that all children are equal in their rights of inheritance and their legal and social position. Natural, adulterous, legitimate children are all in the same position, with respect to the rights of inheritance. There was a controversy to the effect of whether this legislation should be applied to children who *were born after the Constitution,* while others alleged that it should also be applied to those who had been *born prior* thereto, that is, to all children who were *living* at present.

" 'This Senate Bill covers all the children. Those *born before and those born after.* So that those who favor that theory, among them myself, favor that it should be applied to all children. Even though they *were born prior* to the Constitution, for it is the intention of the Bill to include even those who *were born before.*

" 'Mr. Santaliz Capestany: Then, all the children are covered?

" 'Mr. Ortiz: They are all covered. *And let it be recorded that that is the intention of the House in approving this Bill, that the legislation be applied to all the children who were born prior to the Constitution or after the Constitution. It shall cover all children who are now alive.'* It follows: 'The provisions of this Act have retroactive effect to July 25, 1952.' Since the Constitution went into effect July 25, the legislation is effective simultaneously with the Constitution.

" 'Mr. Román García: But could this be construed as if it were effective on July 25, 1952?

" 'Mr. Ortiz: No. What it means is that those children who on July 25 *were born* have the same rights. Those who *were born* by July 25 and those who were born thereafter. (Italics in original)

" '. . . . . . . .'

"At the session on the following day, August 6, 1952, Bill 18 was again brought to the floor and the following proceedings took place in which the Chairman of the Juridical Civil Committee, Hon. Arcilio Alvarado, amply informed:

" 'Mr. Santaliz Capestany: In view of the importance of this bill and the social implications thereof, I wish the Chairman of the Committee would clearly explain to the House whether in Article 2, when it says that the provisions of this law shall be retroactive to July 25, whether it covers all the children, all the legitimate and natural children in equal rights with the legitimate children, in the case that their parents die after July 25.

" 'Mr. Alvarado: The answer to that question is yes, definitively. Yes. I wish to make an explanation although . . .

" 'Mr. Santaliz Capestany: (Interrupting) Another question if my colleague permits me. I have two questions. The other question is the following: Then, in cases of natural children or of illegitimate children in which their parents have died and the cases have been decided, are the inheritance suits filed in the courts of Puerto Rico pursuant to the laws prior to the approval and to the adoption of the Constitution by the People of Puerto Rico covered by this law?

" 'Mr. Alvarado: Those cases in which the predecessor, that is, the one who transfers the inheritance dies or has died prior to July 25, are not covered by this Act. That is, the situation is the following: The Constitution provides that all children shall be equal before the law; and that Constitution went into effect on July 25. Prior to July 25 all children were not equal before the law. They were classified into legitimate and illegitimate children, in adulterous children and they had different rights according to the different classification of their status as children. That ceased on July 25. From and after July 25, by constitutional provision, all children are equal before the law.

" 'You know that we began to deal with this problem not in this Special Session but in the prior Special Session when we were approving acts necessary to implement changes produced by the Constitution. At that time there was a fundamental discrepancy between the Senate and the House; a discrepancy which did not transpire to the public because it was discussed rather in private by the Senate and House members. But the Senate approved the bill by virtue of which the equality between the children provided by the Constitution was *only granted to children born after the effectiveness of the Constitution*. The House did not agree with this view, not officially; unofficially, and after exchanging views among several of the House members we did not agree with that view. We then believed that the bill should grant equality to all the children after the effectiveness of the Constitution, *regardless of whether they were already born and living* and of whatever age they were, even if they were sixty years old, but from the moment that equality is established, that is, from July 25, from then on equality should be maintained for all children alike.

" 'We could not reach an agreement with the Senate in this unofficial manner and then what we did here was that when the bill came approved by the Senate we sent it to the Committee and it was not considered.

" '. . . . . . . .

" 'You know that the rights of inheritance are transferred at the death of the predecessor, at the death of the

person who possesses the property and has the children—the deceased.

" 'According to the bill that we are approving, the children of any person who dies on July 25 or thereafter, shall be considered equal in the distribution of the property, with equal rights, equal to a legitimate child, regardless of whether they had the condition of illegitimate prior to that date. And equality is produced among the children from July 25 and thereafter.

" 'Now, the bill does not go into the cases *of death of the predecessors prior to July 25,* and the situation will be that when the predecessor dies prior to July 25, the matter will be governed by the Act which prevailed at the time of the predecessor's death.

" 'We believe that this should be so, that it is fair and reasonable that it be so. In the first place, there is retroactivity from today to July 25, which is the date when the constitutional change takes place; but we do not interfere with those inheritances which have already been transferred prior to July 25. If at the death of the predecessor prior to July 25 there was any difference between the children we must respect that difference; first, because not to do this would be to give retroactive effect to this Constitution, perhaps meddle with inheritances already adjudicated, give rise to innumerable suits, uproot perhaps a number of questions that have already been adjudicated and decided, which is dangerous.

" '. . . . . . . .

" 'Mr. Alvarado: Yes. And there would be no discrimination by reason of birth under the Constitution. Under the Constitution. Now, prior to the Constitution there were discriminations by reason of birth.

" 'Mr. Valentín Vizcarrondo: Did the Constitution put an end to that?

" 'Mr. Alvarado: It did, from the moment it went into effect; but an adjudication of an inheritance made ten years ago, twenty years ago, a day prior to the effectiveness of the Constitution, was not done under the Constitution. It was done under an Act which provided that there were differ-

ences—disagreeable, bad, contrary to our way of thinking, but they existed and they should be respected by us. Now, any transfer of inheritance . . .

" 'Mr. Valentín Vizcarrondo: Why respected, if the Judiciary . . .?

" 'Mr. Alvarado: No, my colleague, this is something different. They are adjudicated rights under the authority of a former law. In many cases the property has been delivered, in many cases the property has been disposed of by the heirs. If we are to go back, how many years back shall we go? Five, ten, twenty, fifty, a hundred?

" 'Mr. Valentín Vizcarrondo: It does not matter. The Constitution simply says that all children shall be equal.

" 'Mr. Alvarado: No, but that would mean that we would bring to the courts hundreds of suits already adjudicated by virtue of existing laws, which actually granted that right. And it seems to us that we should not unnecessarily provoke a chaos in this matter when we can easily establish the border line from the moment the acknowledgment of that equality is made and we should not go back to when the acknowledgment of that absolute equality did not exist.

" '. . . . . . . .

" 'Mr. Santaliz Capestany: The Constitution makes all citizens equal.

" 'Mr. Alvarado: Will my colleague allow me to explain? It covers them. *This Act is not for those who are born after the Constitution. No one has said that here.* That is not in the Act. A child born *before* July 25 who is 70 years old, who was born in the past century, but whose father is still alive, *if the father dies after the 25th,* that is, *if the right of inheritance is effective after July 25, that person has the same right as a legitimate child. So that it is not the birth that· determines it.*

" 'Mr. Santaliz Capestany: And what if the father died?

" 'Mr. Alvarado: What you are aiming at would require us to turn back prior to July 25 to adjudications already made by the courts, to cases already adjudicated as to who are the heirs under the existing laws which prevailed and were good at that time, and in order to undo everything

that has been done, not knowing how many years back, which in my opinion is not sensible.

" '. . . . . . . .

" 'Mr. Alvarado: That is to say, the inheritance is transmitted by death. This system of equality as to hereditary property is established by the Constitution and it is effective from July 25 *for all the cases in which the predecessor dies on or after July 25*. When the predecessor dies *prior* to July 25, then the inheritance is governed by the legislation prevailing at the time of his death.

" 'Mr. Díaz Marchand: In other words, that *there are no differences established* by virtue of the time or the date in which *the heir is born* in this case?

" 'Mr. Alvarado: *Correct, correct. Exactly.*

" 'Mr. Díaz Marchand: But that the difference lies in the fact of whether the father who is to leave the inheritance—to the son in this case—would still be alive at this moment.

" 'Mr. Alvarado: *That's it*. That the right of inheritance be acquired by the Constitution. That the right of inheritance is acquired by the death of the predecessor. That the predecessor must have died on or after July 25, regardless of *when the child was born*.' (Italics in original.)
"At this stage Mr. Santiago Polanco Abreu intervened, upholding the position taken by Mr. Alvarado:

" 'Mr. Polanco Abreu: I think it is my duty to raise my voice in union of my colleague Alvarado at this moment in which we are discussing a legislation which I have been defending from the very moment that I took my seat in this House, presenting bills year after year and that for one reason or another have not been approved.

 " '. . . . . . . .

" 'So that this legislation which is under our consideration is, I believe, the wish of almost all of us, of all of us who are seated here in the House of Representatives; but within the realistic concept of the principles of law brilliantly stated by our colleague Alvarado, we have no other alternative than to answer those who ask us whether this refers to partitions, wills, made prior to July 25, that this legislation can never be applied to that . . .

" 'Mr. Santaliz Capestany: (Interrupting) Why?

" 'Mr. Polanco Abreu: Because the vested right already existed, because those children had already acquired certain rights, those very natural children had acquired certain rights under the authority of specific legislation. But it should be noted that we have before us a criterion expressed by the Senate in a bill, and, yet, what was our basic position? That the bill as it originally came phrased *only had the scope of protecting the children who were born after July 25,* when the view we take here and which we have maintained for many years is that it should be applied *to all children born prior to the Act,* provided that the parents *die after* July 25.

" '. . . . . . . .

" 'Mr. Ortiz: Mr. Chairman: A few words to explain or express my opinion on this legal or juridical point of view which has been raised here on this matter.

" 'In the first place I wish to remind you that the previous controversy in this Legislative Assembly, in the past Special Session, did not refer to this question we are discussing here now, but to the fact that some believed that this legislation should be applied only to the children born after the Constitution, and others wanted it to be applied to all the children born before or after. I favor the second theory, that is, that it be applied to all the *children* born before or after the Constitution in order to establish that equality.

" 'The Senate Bill applies to the children who are *born after* the Constitution as well as to those who *are born before* but who have not yet acquired vested rights. And here is where the difficulty lies.

" 'The sense of justice of our colleague Valentín and our colleague Santaliz and of other colleagues, that if this legislation is applicable to those born before, then, why establish a difference that the parents should die after the Constitution and why not apply the same principle to those cases in which the parents have died before? That is, to establish absolute equality, absolute justice. But although I understand the justice of the position assumed we must confront certain constitutional difficulties, because, for example, if the parents have died previously it means that the children who

had that parent had acquired certain hereditary rights under the prevailing legislation, that there were partitions, deeds, contracts, that judgments were rendered, litigations decided with all the inherent rights and I assure you it is a legal constitutional principle that a subsequent legislation cannot affect the rights previously acquired. And that is a basic and elementary rule.

" 'Mr. Román García: Mr. President and House fellow members: Incidentally when this bill came yesterday before the consideration of the House, because I have serious doubts which lurked in my mind as to the approval of a legislation of this kind, a sort of small tidal wave went up. And this bill passed to the Committee to be studied. This morning my colleague Arcilio Alvarado before entering into session began to explain to me the scope of this legislation. At first, I must confess, my points of view were the same as those maintained by my colleague Valentín and those maintained by Santaliz.

" 'Now, we should not shut our minds to the reality. The positive reality is that if *there have been partitions, liquidations of inheritance, judgments in the courts and all those proceedings,* if all of them have been consummated already, it seems to me that a provision such as that originally maintained herein, and which has been maintained by colleagues Valentín and Santaliz, it seems to me that a legislation which entails, as explained by Mr. Ortiz, the annulment of those liquidations, those partitions of inheritance which have been previously made, would be unconstitutional.

" 'Mr. Valentín Vizcarrondo: Even though they were unfair, my colleague?

" 'Mr. Román García: We are not dealing with the question of whether they were unjust. I consider that they are not unjust because they were issued and regulated by statutes and laws which existed at the time that those liquidations were made or that the inheritances were declared.

" 'Therefore, I wish to confess that the view that has been discussed herein, has been cleared up in the debate

of this bill and has completely changed my view which I expressed half an hour ago.'

"At the session of August 8, Bill 18 was approved with all the votes in the affirmative, including those of Mr. Santaliz Capestany and Mr. Valentín Vizcarrondo, and thus it became Act No. 17." (Italics in original.)

The foregoing relation shows the reason we have for stating that we decided the case of *Márquez* v. *Avilés*, 79 P.R.R. 816 (Per Curiam) (1957), erroneously. The facts of that case are identical to those in the present case. It deals with an action of filiation filed in 1954 by seven children begotten by a married man with an unmarried woman, born between the years 1926 and 1940. The father died on March 18, 1954. About three years after the effectiveness of the Constitution and Act No. 17. Final judgment was rendered by the Superior Court, Aguadilla Part, on May 10, 1956. Insofar as pertinent it reads:

". . . the amended complaint is hereby granted, decreeing that the aforesaid Carmen, Nemesio, José Antonio, Ismael, Elba Lydia, Wilson, and Edwin Márquez are all the acknowledged illegitimate children of Bonifacio Avilés Pérez, with all the rights inherent to such status of children, including the right of inheritance in the share corresponding to each one of them equal to that of his aforesaid legitimate daughter in the estate left by their father on his death . . ."

As a matter of fact the trial court found proved the concubinage between the father and the mother of the plaintiffs at the time that each one was conceived and born and that they all showed "the uninterrupted possession of status of children of their aforesaid father."

Notwithstanding the postulates of equality and dignity of the human being constitutionally proclaimed in 1952 and of Act No. 17, and notwithstanding the clear and precise legislative statements and expressions in the debates with respect to the scope, purposes, and effects of that Act No. 17, we unjustly modified a judgment which was clearly correct

and in conformance with the constitutional reform and with Act No. 17, thereby depriving seven children begotten by the same father from inheriting from him, on the basis of a mechanic application of those eleven words of the report in question. The immediate effect of the decision of that appeal was the granting of the entire inheritance to the legitimate daughter and denying any share therein to her brothers and sisters.

With respect to that decision, in the aforesaid annotation, XXII *Rev. C. Abo. de P.R.* 278, Chapter V, No. 3, May 1962, Calderón, Jr. states:

"We believe that this problem could have been decided in the affirmative, perhaps with greater solidity in its juridical grounds. It is the Act prevailing at the time of the death of the predecessor that determines the rights of succession, and the Act of 1952 is, as we have seen, to the effect that all children shall have with respect to their parents *and with respect to the property left by the latter,* equal rights as the legitimate children. The legislative intent in the entire recent legislation on this matter is, unquestionably, toward equality among the children. We have already seen that the laws of 1942, for example, improved the condition of the formerly called illegitimate children and gave them a cause of action which they did not have before. Therefore, we believe that irrespective of what the status of the son may be pursuant to the laws prevailing at his birth, it could have been decided that if the father dies after 1952, he has the same rights of succession as the legitimate children. But, we repeat, the Supreme Court has already decided this in the negative and that is the prevailing doctrine."

With still more vigor Mascareñas rejects our position in *Márquez* v. *Avilés* and other cases. In *Revista de Derecho Puertorriqueño,* No. 4, April–June 1962, he says at p. 49:

"In the second place, we wish to express our surprise that the principle of nondiscrimination established by the Constitution should be applicable only to persons born after 1952. After the Act of 1942 all children born out of wedlock are equally natural children. Now, however, the case law introduces a

discrimination: those born before 1952 and those born after. All are natural children, but those born before 1952 shall have one treatment and those born after 1952 another. If the Constitution invalidated the requirements of § 125 of the Code, it must have done so for all natural children. It is inconceivable that a constitutional principle be applicable only to those who are born thereafter. There shall be no discrimination! Ah! but discrimination shall continue for those born before. It shall not be unconstitutional!"

As an end to this part of the present opinion we insert here the guiding expressions stated by Mr. Justice Santana Becerra on this matter exactly two years ago in his concurring opinion in *Berdecía* v. *Tyrell*, 82 P.R.R. 674, 690, 693 (Blanco Lugo) (1961):

"In the terms of the essential equality of all persons as proclaimed by our Constitution, I do not conceive a state of law that may apply said constitutional declaration, with respect to the birth, to those who were born after its proclamation, implying a reservation with respect to its effectiveness which is not mentioned in its text nor contemplated in its spirit, and which would allow various generations to continue in the system of disequality and of the indignity of the human being for lack of the essential equality, until said generations be extinguished by the natural process of their disappearance. It is in this significant sense that the Committee on the Bill of Rights made these statements. 'It is intended *to eliminate,*' it says, the juridical stigma against the children born out of wedlock. '*All* children are deemed,' it continues, with respect to their parents and *with respect to the juridical order,* to have equal rights.

"In the spirit of human revendication through the essential equality of the person in which that part of our Bill of Rights was adopted, I do not conceive a state of law which might affect the generation already begotten, and which even under an advanced legislation concerning children from 1942 to 1952, as it has been interpreted, still maintains that which is still to me a specious situation in the juridico-social aspect where the begetting father and the begotten child are deemed as such for one purpose but not for another, as if nature could play a dual

role. Nor can I conceive within the spirit pointed out, that it was ever contemplated to leave the begotten offspring subject to the contingent peril of a regression in the advanced legislation prevailing at the time of the proclamation of the Constitution, which under the state of law that I point out, would be plausible if it were not extended to those born subsequently.

"I have referred to the essential equality of a child in the person, not in his patrimony. The difference in the patrimony, 'inheritance and properties' does not create stigma. Within the marriage system itself some children have received less patrimony than others, without being deemed, on that account, as not having the essential equality in person. And even with respect to patrimony, after the Constitution, *all children,* no matter when or the condition in which they were born or whether they have been declared such children, are to participate in the inheritance with the same rights.

"I am convinced that by operation of the constitutional declaration, as I see fit to construe it, § 125 of the Civil Code has no reason of being. Having been declared as its father's child, it must be deemed as having the essential equality of person by reason of the superior constitutional declaration. The acts prescribed by § 125—particularly those which the father himself or his family must perform and from which the possession of status arises—which would bring the child into the family as a member thereof and give him a father before the law and society, or which would frustrate him if unable to prove them, are to me, accidents as the Committee on the Bill of Rights stated in its Report, over which the equality before the law must prevail. I consider § 125 much like an anachronism which should pass instantly to take its proper place in a family right which has become historic." (Italics in original.)

The judicial power of all the courts to render judgment, or to reverse or modify them in actions of filiation in Puerto Rico, for the sole purpose of granting the right to use the paternal surname, and none of the other rights enjoyed by the legitimate child with respect to his father and to the property left by him at his death—if it ever existed in pure law—was absolutely and definitively extinguished at the end

of the day of July 24, 1952. From that very moment, either filiation lay for all legal purposes—surname, support, inheritance—or it did not lie for any purpose.

For this reason any judgment of any court in cases of filiation rendered for the sole purpose of using the paternal surname on or after July 25, 1952 is contrary to our Constitution and to Act No. 17 of August 20, 1952.

As doctrinal precedents we hereby overrule the cases of *Márquez* v. *Avilés, supra,* and *Sánchez* v. *Díaz,* 78 P.R.R. 771 (1955), and the dictum, sequel of *Márquez* v. *Avilés, supra,* in the case of *Ex parte Vélez,* 81 P.R.R. 634, 646 (1960).

 For the sake of clarity we hereby declare that our pronouncements of greater significance in the present appeal are:

1. All children may request that their status as children of their parents be declared judicially, with equal juridical treatment;

2. The father, or in his default, his heirs, may acknowledge in any way their children, expressly or impliedly, regardless of the dates or circumstances of their births and for all legal purposes;

3. No judicial declaration of the status of child shall make any pronouncement as to the legitimacy or illegitimacy of the birth of the petitioner nor as to the civil status of his parents. The petitioner shall be simply called "child" and his progenitors "father" or "mother," as the case may be;

4. Every judicial declaration of status of child shall be based on the establishment of the fact of natural or biological paternity, regardless of the date or other circumstances of birth, it being sufficient that said paternity be satisfactorily proved, under the usual rules of evidence, pursuant to the preponderance of the evidence and in conformance with the findings which, taking into consideration the concurrent circumstances of the case, represent the most

rational, just and juridical balance in the determination of the case. The rules or requirements of proof contained in § 125 of the Civil Code, 1930 ed., 31 L.P.R.A. § 504, shall not be applied to any action or proceeding in filiation whether in prosecution or filed hereafter;

5. Any judicial declaration of status of child shall acknowledge and decree that the child so declared shall have with respect to his parents and with respect to the property left by the latter, the same rights that correspond to the legitimate children, regardless of the date or other circumstances of his birth, with the exception that the right of inheritance with respect to children born out of wedlock prior to August 10, 1942, who did not have the condition of natural children according to the former legislation and who were not acknowledged by the voluntary action of their parents, shall be acknowledged with respect to the deaths occurring from and after the beginning of the day of July 25, 1952;

6. The hereditary right of all children, without any exception, shall be determined by the law applicable and prevailing at the death of the predecessor;

7. The second paragraph of § 2 of Act No. 229 of May 12, 1942—31 L.P.R.A. § 502—as amended by Act No. 243 of May 12, 1945, was impliedly repealed as contrary to/or irreconcilable with Act No. 17 of August 20, 1952, and insofar as said second paragraph limits the effects of the action of filiation which authorizes the use of the surname;

8. Section 125 of the Civil Code, 1930 ed.—31 L.P.R.A. § 504—as to its third paragraph and subdivisions (1), (2), (3) and (4), was impliedly repealed by operation of Acts Nos. 229 of 1942, 243 of 1945, and 17 of August 20, 1952.

Let us now turn, in harmony with our rulings stated so far in the present opinion, to the respective provision of the eight appeals to which it refers.

As has been noted, in each of those cases the trial court determined affirmatively the fact of paternity of the plaintiff child with respect to the defendant father or to the predecessor of defendant's heirs. That determination of paternity has not been controverted in general. In the appeals in which it may be averred that it has been controverted, we have found that from the pleadings and the admissions of the parties or from the evidence admitted, the fact appears manifestly, indubitably and authentically. With this it would be sufficient for the petitioners in each one of these cases to obtain their filiation for all legal purposes.

In three of those cases—*Camacho* v. *Torres*, *León* v. *Zayas*, *Ocasio* v. *Díaz*—the plaintiff son or daughter was born prior to the effectiveness of Act No. 229 of 1942. In the first of them, in December 1927, in the second, on December 3, 1938, and in the third, on January 26, 1939, that is, on July 25, 1952, they were 24, 13, and 13 years of age. In the other five cases they were born after August 10, 1942, but prior to July 25, 1952 and they were, of course, covered by the new concept of natural children created by said Act No. 229.

With the exception of the case of *Cañizares* v. *Godreau*—child born on December 13, 1951, and action commenced on February 7, 1952—in all of them the respective fathers were married at the moment of the conception and birth, but the actions were filed after the effectiveness of the Constitution and of Act No. 17 of August 20, 1952. The judgments were rendered between June 25, 1953 and June 29, 1962. With the exception of the case of *Camacho* v. *Torres* in which the father died in November 1958, the fathers lived at the time that each case was decided.

1. In the case of *Ramón Ocasio* v. *Andrés Díaz*, No. R-85, the summary judgment rendered June 5, 1958 by the Superior Court, Bayamón Part, *will be affirmed*, but the

declaration contained in its last paragraph will be modified to read thus: ". . . and consequently we declare Ramón Ocasio the son of Andrés Díaz, for all legal purposes."

2. In the case of *Reinaldo León, etc.* v. *José L. Zayas, No. 12490*, the judgment rendered by the Superior Court, San Juan Part, on February 28, 1958, *will be affirmed* and modified for the purposes of declaring plaintiff Reinaldo León the son of José L. Zayas for all legal purposes.

3. In the case of *Félix López, etc.* v. *Nicolás Cancela, No. R-275*, the judgment rendered on January 25, 1960 by the Superior Court, Mayagüez Part, *will be reversed* and another judgment rendered instead declaring plaintiff Félix López son of defendant Nicolás Cancela for all legal purposes.

4. In the case of *Carmen Gloria Rivera, etc.* v. *Arturo Defontaine, No. 11437*, the judgment rendered on May 27, 1954 by the Superior Court, Humacao Part, will be modified for the purpose of declaring plaintiff the daughter of defendant Arturo Defontaine for all legal purposes, and *as thus modified, it will be affirmed.*

5. In the case of *Angelita Robles, etc.* v. *Mario Hernández, No. 11657*, the judgment rendered on March 9, 1955, by the Superior Court, Bayamón Part, will be modified for the purpose of declaring the plaintiff Alba Nydia Robles the daughter of Mario Hernández, for all legal purposes, and *as thus modified, it will be affirmed.*

6. In the case of *Iris Cañizares Quiñones, etc.* v. *José Godreau, No. 11377*, the judgment rendered on June 25, 1953 by the Superior Court, Ponce Part, will be modified for the purpose of declaring plaintiff minor, Víctor Manuel Cañizares, the son of José Godreau for all legal purposes, and *as thus modified, it will be affirmed* in all its pronouncements, including the payment for support claimed and the imposition of attorney's fees.

7. In the case of *Roberto Castillo, etc.* v. *Manuel Nieves Bonet*, No. R-62-164, the judgment rendered on May 2, 1962 by the Superior Court, Mayagüez Part, *will be reversed* and another rendered instead declaring plaintiff Roberto Castillo the son of Manuel Nieves Bonet, for all legal purposes.

8. In the case of *Esther Camacho Torres* v. *Angelina Torres, Agustín Camacho, and the heirs of the predecessor Rafael Arrieta Ríos*, No. R-62-215, we determined that the pronouncements of the trial court in its judgment of January 12, 1961, rendered by Judge Luis R. Polo, as well as its final judgment of June 29, 1962 rendered by Judge Miguel A. Velázquez Rivera, should not prevail insofar as they denied plaintiff her hereditary rights in the succession of her father; the final judgment rendered by Judge Miguel A. Velázquez Rivera *will be modified* for the purposes of declaring, further, that plaintiff Esther Camacho Torres is the legitimate heiress of Rafael Arrieta Ríos, her predecessor and father, together with the other heirs of the deceased and pursuant to the legislation existing at the time of her father's death, and *as thus modified, it will be affirmed.*[*]

---

[*] COMPILER'S NOTE: The judgment rendered by the Supreme Court in this case provides in part as follows:

"It was so decreed and ordered by the Court as witnesses the signature of the Chief Justice, who joins the opinion and also submits his own concurring vote.

Mr. Justice Pérez Pimentel states that for the reasons which he shall set forth in a separate opinion, he agrees with the overruling of the case of *Márquez* v. *Avilés*, 79 P.R.R. 816, and those which followed, but that he dissents from the following doctrines adopted by the majority:

1. That the admission of paternity or of acts of acknowledgment made by a father in the answer to the complaint of filiation is equivalent to a voluntary acknowledgment for the purposes of Act No. 229 of May 12, 1942, as amended by Act No. 243 of May 12, 1945.

2. That the judicial determination of the existence of facts compelling the father to acknowledge the child, is also equivalent to a voluntary acknowledgment by virtue of the so-called doctrine of tacit acknowledgment.

3. That § 125 of the Civil Code was repealed by Act No. 229 of 1942,

—O—

MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ, concurring.

San Juan, Puerto Rico, June 27, 1963

With the opinion rendered today by this Court through Mr. Justice Hernández Matos, full effectiveness of live law is finally bestowed, because of its sense of just law, a fundamental principle of equality of men—essential basis on which rests the postulate that the dignity of the human being shall be inviolable.

The doctrine of the application of judicial precedent—stare decisis—as a rule for the stability of the law, cannot surpass the basic rule to do justice, which is founded on the inherent rectitude of the judgment, nor can it deny effect to the juridical truth which is based on the values inherent in the right involved.

The doctrine of stare decisis must rest on the very virtue of the precedent which is invoked and no erroneous interpretation of the law—particularly a restrictive interpretation of remedial legislation which is directed to the very core of our society—should lay down an eternal foundation in the juridical order to sanction negatory states of the human personality.

—O—

MR. JUSTICE PÉREZ PIMENTEL, dissenting and partly concurring.

---

as amended, and Act No. 17 of August 20, 1952.

The inapplicability of the aforesaid § 125 of the Civil Code to children not covered by Act No. 229 of 1942.

4. Retroactive application of the Commonwealth Constitution to the right of filiation.

Mr. Justice Santana Becerra reserves the right to express himself in due time, if he believes it to be necessary, on the matters mentioned in Nos. 3 and 4, by Mr. Justice Pérez Pimentel."

San Juan, Puerto Rico, September 18, 1963

Ramón Ocasio, born prior to the effectiveness of Act No. 229 of 1942, as amended in 1945, filed an action of filiation against Andrés Díaz in January 1957 and prayed for "judgment against the defendant, declaring him acknowledged natural son with all the rights inherent to that status." In the only two paragraphs of his complaint he alleged:

"1. That plaintiff Ramón Ocasio was born from the marital relations had between the defendant Andrés Díaz and plaintiff's mother Carmen Ocasio, about the year 1938 and he was born in Bayamón, Puerto Rico on January 26, 1939 and was recorded on February 4, 1939 in the Registry of Vital Statistics under No. 7105.

"2. That since his birth plaintiff has always been held and furnished with all the necessities as a son by his father, that he has been called such publicly and on his advice and instructions he uses the surname of Díaz, which paternity and surname plaintiff must establish and legalize pursuant to law, for all legal purposes, since the defendant has not yet complied with his duty, notwithstanding the fact that he offered to do so, since plaintiff shall have to register in the military service of the United States on the 27th of this month and he must do so with his legal name, Díaz."

After several preliminary incidents the defendant answered and alleged:

"1. Of the first paragraph of the complaint the defendant *accepts that the plaintiff was born from marital relations had between the defendant Andrés Díaz and Carmen Ocasio*; for lack of sufficient information to form an opinion with respect to the veracity thereof defendant denies generally and specifically each and every one of the other allegations contained in the first paragraph of the complaint. (Italics ours.)

"2. Of the second paragraph the defendant *accepts that from the day of plaintiff's birth he has always attended him in all his necessities as his child.* He denies that he ever called him his son in public or that he does so at present. He denies that on his advice and instructions he uses the surname Díaz. For

lack of information he denies that plaintiff had to register in the military service on January 27 of this year. He denies the other allegations of the second paragraph.

"SPECIAL DEFENSE. As special defense the defendant states:

"1. That since May 10, 1936, up to the present time, the defendant has been legally married to Sixta Nieves. For this reason the plaintiff could not be declared, as sought in the complaint, as an acknowledged natural child with all the rights inherent to said status.

"WHEREFORE, the defendant prays this Honorable Court to enter an order pursuant to the allegations stated by the defendant."

The plaintiff then moved for summary judgment declaring him acknowledged natural son with the right to bear the surname of his father in harmony with our decision in *Cruz* v. *Andrini*, 66 P.R.R. 119 (1946). For the purposes of this motion the plaintiff accepted that his father was married with Sixta Nieves since May 10, 1936. Actually, plaintiff is an adulterine child.[1]

After the defendant filed an opposition to plaintiff's motion, the court rendered summary judgment declaring him the acknowledged natural son of Andrés Díaz *for all legal purposes*.

The trial court did not limit the legal effects of the acknowledgment to the use of the father's surname and held that the answer filed by the defendant in the suit constituted a public document in which the defendant acknowledged plaintiff as his son and that therefore it was a voluntary acknowledgment.

In the majority opinion this Court accepts the grounds on which the judgment of the trial court is based and it even goes further in holding that "from that date on (when defendant filed his answer, June 10, 1957) the fundamental

---

[1] For a statement of the facts in the other cases we refer to the declaration contained in the majority opinion.

fact of the natural paternity, already established in a public document, had ceased to be subject to judicial appreciation, the continuation of the controversy was rendered useless and it was not even necessary that the same be adjudicated by judgment in order to consider that the status had been created."

Once we agree in that the case of *Márquez* v. *Avilés*, 79 P.R.R. 816 (1957), should be overruled insofar as it decides that adulterine children born prior to the effectiveness of Act No. 229 of May 12, 1942, as amended, are not entitled to participate in the inheritance of their father, if the latter dies after July 25, 1952, the question under consideration in this appeal with respect to the effects of an admission in the answer, lacks importance because the adulterine child born prior to the effectiveness of Act No. 229 would be entitled, when judicially declared the natural son of the defendant father, even if said acknowledgment is deemed involuntary (1) to receive support from his father,[2] (2) to bear the father's surname[3] and (3) to receive the hereditary share fixed by Act No. 17 of August 20, 1952.

The question, however, gains significance when it involves adulterine children born prior to the effectiveness of Act No. 229 of 1942 when the father has died prior to July 25, 1952. The reason is obvious. If the child is not acknowledged by the voluntary action of its father and, in default thereof, by the persons with a right to the inheritance, said child shall be considered a natural child for the sole purpose of bearing his parents' surname. Act No. 229 of 1942, as amended. Hence, it is essential to determine whether the acknowledgment is voluntary or involuntary for in the latter case, and because the father died prior to July 25, 1952, said child would not be entitled to the hereditary rights deter-

---

[2] Section 128 of the Civil Code (31 L.P.R.A. § 507); Act No. 108 of April 30, 1940.

[3] Act No. 229 of May 12, 1942, as amended.

mined by Act No. 17 of 1952, as decided in the majority opinion.

It is a known fact that since March 9, 1911, only natural children could be acknowledged, that is, those born out of wedlock, of parents who at the time of the conception of said children could have intermarried with or without dispensation. Section 193 of the Civil Code of Puerto Rico of 1902, amended by Act No. 73 of March 9, 1911; *Ex parte Hernández*, 65 P.R.R. 132 (1945). From that date on adulterine children could not be recognized by their parents either voluntarily or involuntarily. At least the voluntary acknowledgment of an adulterine child was subject to attack and did not create a permanent and final status of acknowledged natural child. *Fernández* v. *Heirs of Fernández*, 66 P.R.R. 831 (1947). Nor can the adulterine child be legitimated by the subsequent marriage of its parents. *Ex parte Hernández, supra.*

But in the year 1942 our Legislature changed the concept of natural children with the approval of Act No. 229 of that year by providing, insofar as pertinent, as follows:

"Section 1.—All children born out of wedlock subsequent to the date this Act takes effect, shall be natural children, whether or not the parents could have married at the moment when such children were conceived. These children will be legitimized by the subsequent marriage of the parents, to each other.

"Section 2.—Children born out of wedlock prior to the date this Act takes effect, and who lack the qualifications of natural children according to previous legislation, may be recognized for all legal purposes by the voluntary action of their parents, and in their default, by that of the persons having the right to inherit therefrom. These children will be legitimized by the subsequent marriage of the parents, to each other."

The new concept of natural children was given prospective effect. Section 1 of the aforesaid Act did not alter the status of adulterine children born prior to its effectiveness; but Section 2 authorized the voluntary acknowledgment of

these adulterine children for all legal purposes and further declared that they would be legitimized by the subsequent marriage of their parents.[4] For the sake of the discussion that follows we should always keep in mind the phrase "may be recognized by the voluntary action of their parents, and in their default, by that of the persons having the right to inherit therefrom", used in Section 2 of the aforesaid Act, because when the Legislature adopted that language it was perfectly aware of its legal meaning as defined by this Court since 1909 in the case of *Gual et al.* v. *Bonafoux et al.*, 15 P.R.R. 545 and in others which I shall comment on in discussing the doctrine of implied acknowledgment adopted by the majority opinion.

For the time being we need only recall the words of this Court in 1910 in the case of *Amsterdam et al.* v. *Puente et al.*, 16 P.R.R. 527, 532, and which I quote:

"It is conceded that there have always been two kinds of acknowledgments, one voluntary and one obligatory. The distinction between these two kinds of acknowledgments is drawn in the Gual case, when it speaks of the rights consequent upon a solemn and authentic recognition of natural filiation (p. 6 of opinion in Gual case). What these acts of solemn acknowledgments are were partly set out in section 131 of the Spanish Civil Code, as follows:

" 'The acknowledgment of a natural child shall be made in the record of birth, by will, or by any other public instrument.'

"We think it is a fair deduction from the provisions of the Civil Code, heretofore in existence, as well as the practice and jurisprudence in this regard that, without some authentic act which reveals the will of the father to give the child a status, the child has only a right of action to compel the father to confer such status. Section 135 of the Spanish Civil Code and section 189 of the Porto Rican Civil Code provide for the cases when a father is compelled to acknowledge his illegitimate child.

---

[4] *Correa* v. *Heirs of Pizá*, 64 P.R.R. 938 (1945).

He can be compelled by an action, and the necessity for such action can only be said to be dispensed with when there are some solemn acts on the part of the father, which show that this obligation has already been performed. It is the plain inference from these sections that although a father may have done, as in the case before us, any number of acts to show that a particular person was his child, yet he cannot be said to have acknowledged him according to the legal use of the word 'acknowledgment.' If he may be compelled then before such compulsion the *desideratum* has not been attained. Until there is some solemn act or some declaration on the part of a court a child cannot be said to have acquired the civil status of an acknowledged natural child."

The existence of two types of acknowledgments, voluntary and involuntary, was reaffirmed in a number of subsequent decisions, among them, *Puente et al.* v. *Puente et al.*, 16 P.R.R. 556 (1910); *Rijos* v. *Folgueras et al.*, 16 P.R.R. 593 (1910); *Calaf et al.* v. *Calaf*, 17 P.R.R. 185 (1911); *Figueroa* v. *Díaz et al.*, 19 P.R.R. 683 (1913); *Delannoy* v. *Blondet*, 22 P.R.R. 219 (1915); *López* v. *López et al.*, 23 P.R.R. 766 (1916); *Figueroa* v. *Díaz et al.*, 20 P.R.R. 270 (1914). It is obvious that in approving Act No. 229, the voluntary action mentioned therein could be no other than the "voluntary acknowledgment" sanctioned in the decisions of this Court and which is none other than the statement of the father in the birth certificate or in any other public document as authorized by section 125 of the Civil Code. In 1942 the Legislature amended section 31 of Act No. 24 of April 22, 1931 to permit the acknowledgment of a natural child by an affidavit also. Act No. 117 of May 12, 1943. *Ramos* v. *Rosario*, 67 P.R.R. 641 (1947). It should be noted that pursuant to Act No. 229 of 1942, if the adulterine child born prior to the effectiveness of the Act was not acknowledged by the voluntary action of its parents, it lacked the right of action to compel its parents to recognize it. We so held in *Correa* v. *Heirs of Pizá*, 64 P.R.R. 938 (Opinion of May 9, 1945).

Because of its solid reasoning, I quote from said case, at p. 940, as follows:

"The crucial question here is whether the action of a father subsequent to 1942 in supporting an adulterous child and admitting parenthood result in conferring on such a child born prior to 1942 the *status* of a natural child; that is, whether those 'acts' are the recognition 'by the voluntary action' of the father contemplated by § 2 of Act No. 229. In approaching this question, we must bear in mind that the Legislature did not enact this statute in a vacuum. It was passed in the light of our Civil Code, particularly § 125 thereof. This is evident not only from the terms of the statute itself, but also from a colloquy on the floor of the Senate between Senators Géigel Polanco and Iriarte. *Actas del Senado,* 1942, pp. 799–801. To the same effect, Muñoz Morales, Act No. 229 of 1942, and its Implications, 'La Toga,' issue of October 16, 1944, pp. 6–7.

"Section 125 of the Code defines as natural children 'those born out of wedlock, from parents who, at the moment when such children were conceived or were born, could have intermarried with or without dispensation.' Section 125 then goes on to set up two methods of recognition of a natural child: (1) by the voluntary action of the father 'either in the record of birth or in the testament or in any other public instrument'; or (2) by a judicial action in which 'The father is *obliged* to recognize the natural child: . . . 2. Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family. . . .' (Italics ours.)

"It is therefore evident that under § 125 status as a natural child is conferred (1) voluntarily by the father by a written instrument only; or (2) involuntarily by a judicial proceeding forcing the putative father to recognize the child if the parent conducts himself in a certain manner. Section 1 of Act No. 229 of 1942 eliminates the barrier of adultery which in the past § 125 has raised against recognition of children as natural children. But § 1 is prospective, and relate only to children born subsequent to the effective date of the Act. And § 2, applying to children born prior to the Act, is narrow; the Legislature was careful in it not to disturb existing relationships.

744

Nevertheless, § 2 does provide that such adulterous children could also be recognized as natural children—but only 'by the voluntary action' of their parents.

"When § 2 is read in the light of § 125 of the Code, it is obvious that the acts and statements of the father subsequent to 1942 described in the complaint herein admitting parenthood are not the 'voluntary action' contemplated by § 2. Voluntary action, as § 125 indicates, means execution by the father of a birth certificate, deed, or other public instrument. The allegations of the complaint might well have entitled the plaintiff under § 125 to force her father to recognize her involuntarily as his natural child pursuant to a judicial order to that effect, if she had not been an adulterous child. But § 2 of Act No. 229, in providing for possible recognition of adulterous children who, like the plaintiff, were born prior to May 1942, limits this to recognition by voluntary action only, within the meaning of that phrase in § 125 (*Actas del Senado, supra,* Muñoz Morales, *supra*). This requires a recordation, will, or other public instrument by the father. And that did not occur here."

But in 1945, the Legislature approved Act No. 243 of May 12 of that year to amend by addition section 2 of Act No. 229 of 1942.[5] The amendment consisted in granting a cause of action to the adulterine child born prior to the effectiveness of Act No. 229 who was not acknowledged

---

[5] Said section 2, as amended, provides:

"Children born out of wedlock prior to the date this Act takes effect, and who lack the qualifications of natural children according to previous legislation, may be recognized for all legal purposes by the voluntary action of their parents, and in their default, by that of the persons having the right to inherit therefrom. These children will be legitimized by the subsequent marriage of the parents, to each other.

"In case the children referred to in this section are not recognized by the voluntary action of their parents, and in default of the latter, by that of the persons having the right to inherit therefrom, said children shall be considered as natural children for the sole purpose of bearing the surname of their parents. The action for this recognition shall be prosecuted in accordance with the procedure fixed by the Civil Code of Puerto Rico for the recognition of natural children; *It being understood, however,* That such a recognition shall only have the scope herein expressed."

by the voluntary action of its parents, and in their default, by that of the persons with a right to inherit therefrom, to assert its status of acknowledged natural child but limited for all legal purposes to bearing its parents' surname.

The majority of the Court has just decided that if the adulterine child exercises the action of filiation under the aforesaid amendment of 1945 and in the answer to the complaint the defendant father accepts the paternity or the alleged facts of uninterrupted possession of status of child, it is tantamount, and at law is, an acknowledgment by the voluntary action of the father.

In part it argues:

"The mere fact that the defendant father established or acknowledged the consanguineous bond existing between him and his son, in the course of a filiation action, does not mean that the acknowledgment was involuntary. What it really means is that in his complaint the son stated a certain and true fact and doing honor to that certainty and truth, the defendant father, who knows it, of his own will accepts it and confesses it. And he freely goes further than proclaiming his condition of father: he admits, accepts, and confesses that from his birth and thereafter he has attended him in all his necessities *as a son.* . . . In our procedural system it is expected that the parties will speak the truth, in obedience to the law and elementary respect to justice. They should make averments of fact in conformance with the truth. The Rules of Civil Procedure do not contain any reproach of a criminal tenor for the defendant who does not answer a complaint or who fails to accept the truth of the facts properly alleged therein. They do not preclude a father, within an action of filiation, from choosing by his voluntary action, to occupy juridically his position of father and spontaneously relate the facts that originated that situation, with all the juridical consequences that might ensue, as Andrés Díaz did herein." (Pp. 681 to 682.)

Let us examine this farfetched juridical reasoning. Andrés Díaz, the defendant father, did not perform any voluntary act by virtue of which the plaintiff son acquired his

status of acknowledged natural son. If such a voluntary action on the part of the father had taken place, the action of filiation would have been unnecessary. Why was the suit filed? Was it not alleged by the plaintiff in his complaint that the defendant has not complied with the duty of acknowledging him as his child? Why was this allegation made? Because the complaint was filed to compel the father to recognize him either by his own admission of the facts which led to the acknowledgment or, if he should deny them, by the action of the court declaring them proved. The defendant accepted the true facts alleged in the complaint. But since the prayer of the complaint requested the court to declare that plaintiff was defendant's son "with all the rights inherent to said status," the defendant could believe, as apparently did the majority of this Court also, that plaintiff's cause of action was not the one created by Act No. 243 of 1945 which limited the effects of the filiation action of the adulterine child to bear the surname of his parents, and he appeared in the action to allege an essential fact which did not appear from the complaint, to wit: that at the time of the "conception of the plaintiff, defendant was legally married to another woman."

It having been accepted in the majority opinion, I feel relieved from insisting on the doctrine that the admission, acceptance, or confession of facts in a judicial controversy has a probatory function: it makes proof against its author, it relieves the other party from the obligation to prove them, and, as a general rule, compels the trier to decide in accordance with the facts admitted, accepted, or confessed. But the Court eludes this rule by making it inapplicable to suits filed under Act No. 229, as amended, on the ground that the express admission, acceptance, or confession of the fact of paternity operates as a full acknowledgment by voluntary action with all the legal consequences "notwithstanding the attempt of the defendant father to subject its nature to his

own terms and conditions." It then follows that when it is not alleged in the complaint that the plaintiff child is adulterine, the father cannot appear to allege and prove that fact if on the other hand the fact of the paternity is true and he is compelled, by reason of moral order and judicial proceeding, to accept it. Two solutions are offered by the Court to defendants who are placed in that situation: (1) not to answer the complaint, and (2) to deny the true facts alleged in the complaint, since the Rules of Civil Procedure "do not contain any reproach of a criminal tenor for the defendant who does not answer a complaint or who fails to accept the truth of the facts properly alleged therein."

I consider rather unfortunate the solution offered by the Court to a defendant who feels compelled to answer the complaint to bring to the suit the very essential fact, for the purposes of the cause of action, that the plaintiff is an adulterine child.

In the first of these solutions the Court muzzles the defendant father, deprives him from presenting the true issue in the suit, curtails him in such a manner that if the defendant risks answering the complaint honestly to establish the fact that the claimant child is adulterine, he is penalized with the following pronouncement: "You have made a voluntary acknowledgment and therefore the plaintiff is an acknowledged natural son with all the rights inherent to said status." But in order to avoid this, the Court advises him to answer and deny the facts which are true.

The first effect of this proposition, although not the worst, is to destroy the purpose and aim underlying our Rules of Civil Procedure. From appellant's brief in the *Ocasio* case, we copy, as wholly pertinent, the following:

"Turning to the Rules of Civil Procedure in force, it seems impossible for us to interpret them in the sense that an admission of paternity in an Answer to a Complaint of filiation is not exclusively limited to exonerate or relieve the plaintiff from

the obligation of offering evidence at the trial on the fact of the paternity, but that it also operates in the sense that said admission of paternity is a voluntary recognition because it was made in an authentic document, in the event that said Answer was such a document for the aforesaid purposes.

"If such were the case, the purpose of the Rules of Civil Procedure would be defeated, because once a defendant in filiation knows, or for that matter, his counsel, that an admission of paternity made by him in an Answer, Interrogatory, Bill of Admissions, Depositions, or Pre-trial Conference is tantamount to a voluntary act of acknowledgment of paternity made in a public document, all in the light of Act No. 229 of 1942, and its amendments, the litigant would take great pains not to make such an admission, and such an attitude would ultimately mean that plaintiff would be unnecessarily bound to prove the paternity; or, in other words, we would be going back to the procedural system prevailing prior to the promulgation of said Rules of Civil Procedure and which is now repealed. In other words, that if the interpretation applied by the respondent court to defendant's admission of paternity as a voluntary acknowledgment were to subsist, he would be penalized for having honestly and frankly complied, like his counsel, with said Rules of Civil Procedure." (Pages 13, 14.)

A brief examination of the Rules of Civil Procedure reveal the purpose of discouraging unnecessary controversies of fact and of condemning the practice of denying the truth in the suits. See, for example, Rules 6.2 and 9.[6]

---

[6] Said Rules provide:

"6.2. *Defenses; form of denials*

"The party shall state in short and plain terms his defenses to each claim asserted, and shall admit or deny the averments upon which the adverse party relies. If he is without knowledge or information sufficient to form a belief as to the truth of an averment, he shall so state and this has the effect of a denial. Denials shall fairly meet the substance of the averments denied. When a pleader intends in good faith to deny only a part or a qualification of an averment, he shall specify so much of it as is true and material and shall deny the remainder. The pleader may deny specifically each of the averments or paragraphs of the preceding pleading, or he may generally deny all the averments or paragraph of such pleading,

The same purpose is pursued by the Canons of Professional Ethics which govern the conduct of the attorneys in Puerto Rico. The attorney must be sincere and honest. "It is unprofessional and dishonorable"—says Canon 22, in part— "to deal other than *candidly with the facts* in taking the statements of witnesses, in drawing affidavits and other documents, *and in the presentation of causes.*" (Italics ours.)

This being so, this Court should not, under the guise of justifying a decision, encourage the defendant not to allege what is true, or to deny the truth of the true facts properly alleged.

It is correct to state that in *Cortés* v. *Cortés*, 73 P.R.R. 643 (1952) and *Rivera* v. *Rivera*, 78 P.R.R. 865 (1956), we held that the voluntary acknowledgment by a father of his adulterine child born prior to the effectiveness of Act No. 229 of 1942, as amended, entails all the consequences fixed by the law, the father being unable to limit or condition them in any way. The doctrine was applicable to the facts of both cases. In the *Cortés* case, the father acknowledged volun-

except such averments or paragraphs as he expressly admits; but, when he does so intend to controvert in good faith all the averments of such preceding pleading, he may do so by general denial subject to the obligations set forth in Rule 9."

"RULE 9. SIGNING OF PLEADINGS

"Every pleading of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it and that it is not interposed for delay. If a pleading is not signed or is signed with intent to defeat the purposes of this rule, it may be stricken as sham and false and the action may proceed as though the pleading had not been served. For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action. Similar action may be taken if scandalous or indecent matter is inserted or if use is made of offensive or obscene language."

tarily his adulterine child Nicolás Cortés Córdova in a public deed executed on September 15, 1943. In an open will executed subsequently the father makes a legacy in favor of his aforesaid son and declares that he has granted him the right to use his surname. In an affidavit signed in October 1947, said father also acknowledged as his natural son Buenaventura Cortés Ríos "with the right to use my surname." On the basis of the preceding facts we held that the voluntary action of the father mentioned in section 2 of Act No. 229 of 1942, as amended, requires the acknowledgment on the part of the father in the birth certificate, in a will, or in any other public document or in affidavit. We then said at p. 654: "Act No. 229 of 1942 itself, as amended, limits the right of children, who previously lacked the qualifications of natural children, to merely bear the surname of their parents, to those children who are not recognized by the voluntary action of their parents. Therefore, children recognized by the voluntary action of their parents, as is the case here, are entitled not only to bear the surname of their parents, but also to the hereditary portion determined by law. The mere fact of the acknowledgment implies the legal consequences we have mentioned and the predecessor may not, by statement, curtail or limit such legal consequences, nor cut down the hereditary rights of his natural children validly recognized, just as a testator can not deprive forced heirs of their legal portion. Once the father validly recognized those two children, he could not by himself limit the scope of the Act."

In the *Rivera* case, the defendant signed the birth certificate of his daughter Olga Iris as her father. We held that the signing of the birth certificate of Olga Iris as her father "established ipso facto her filiation, without the need for further determination or confirmation by the courts; and such act of voluntary acknowledgment entails all the consequences fixed by law, which can not be limited or restricted by the father in any manner whatever."

· Hence, in both cases the children were acknowledged by the voluntary action of their parents, in a public deed, in an affidavit, and in the birth certificate, respectively. Act No. 229 is clear and conclusive. An acknowledgment thus made is so considered for all legal purposes. In such cases the parents are precluded from limiting the effects of the law; but when the father has not gone voluntarily to the Registry of Vital Statistics to sign the birth certificate of the child, nor has voluntarily executed any public deed or will or any other public document nor has signed an affidavit recognizing the child, but, on the contrary, the child is compelled to go to the courts to force his father to recognize him, and the father in his answer accepts, let us say, the paternity but in turn alleges and proves or it is admitted, as happened in this case, that the plaintiff is an adulterine child, and judgment is rendered by the court declaring the plaintiff an acknowledged son of the defendant father, for the sole purposes of bearing his surname, it is not the father who is limiting the effects of said acknowledgment, but Act No. 229 itself in providing in section 2 thereof that in case that the children mentioned in that section were not recognized by the voluntary action of their parents, and in their default, by the persons with a right to inherit therefrom, said children shall be considered natural children for the sole purpose of bearing their parents' surname. It is not a voluntary action on his part where the father is brought to court to do something he has refused to do, and upon being summoned, is bound, by the Rules of Civil Procedure as well as by the Canons of Professional Ethics, as we previously stated, to accept the true facts properly alleged. Unfortunately this Court has mistaken the effects of an admission in an allegation with the scope of a voluntary action of acknowledgment. Admitting that an allegation in the record of a case is a public document and that pursuant to the Civil Code and our case law, one of the means to acknowl-

edge a child is by the execution of a public document, for an acknowledgment made in a public document to constitute a voluntary action on the part of the father, according to the meaning given by the Legislature to the concept of "voluntary action" in Act No. 229 of 1942, as amended, it is necessary that the execution of the public document flow from the free and spontaneous action of the father or from his free discretion or determination and not by force or necessity extraneous thereto; but when the father, forced by a judicial order and in compliance with the obligation imposed on him by the rules of procedure, "executes" the public document (answer to the complaint) recognizing the paternity, it cannot be stated in good logic nor in proper legal hermeneutics, that the father made a voluntary acknowledgment, for the purposes of the legal consequences which, under the terms of Act No. 229, said acknowledgment entails. This alone makes the case of *Ex parte Morales*, 30 P.R.R. 848 (1922) inapplicable and distinguishable.

For the majority of the Court the case of *Alvarez v. Alvarez*, 77 P.R.R. 862 (1955) does not constitute a persuasive precedent and, of course, it does not because it is contrary to their view. It is quite impossible to make anyone believe what he does not want to believe, but because of the force of the reasons or grounds which support the *Alvarez* case, I quote from pages 866–868 the following:

"We need not discuss whether or not the record of the pretrial conference is a public document, or the means for establishing the existence of voluntary recognition mentioned in Act No. 229, as amended, for in the case at bar the voluntary action of recognizing the appellants as children of Alvarez Santana, for all legal purposes, is entirely lacking.

"Appellants contend that the pretrial conference was held at the instance of the appellees, and that the latter, forced heirs of Alvarez Santana, 'of their own volition, freely and spontaneously admitted that the plaintiffs-appellees were the children of the same father . . . , that is, they voluntarily admitted the

paternity . . . thereby making a voluntary acknowledgment,' adding that 'there was no controversy as to the action of filiation. On the contrary, plaintiffs-appellants were recognized by voluntary action, thereby expressly complying with Act No. 229 of May 12, 1942 . . . , as amended by Act No. 243 of May 12, 1945. . . .'

"The appellees had a perfect right to request a conference. Moreover, it was the duty of the attorney for the appellees to request one if in his opinion the issues could be simplified thereby and the presentation of evidence avoided as to one or more matters involved in the litigation; and it cannot be inferred from that fact that the action of the attorney was motivated by purposes alien to those of Rule 16 of the Rules of Civil Procedure, or to bring about consequences other than those resulting normally and which may be anticipated from that proceeding. After the conference was held, it was the duty of the attorney to cooperate in order that the said Rule might serve its purposes, and without doubt the attorney for the appellee would have been reprehensibly obstinate if, knowing that appellants were the children of Alvarez Santana, he had refused to admit it, compelling them to offer evidence at the trial in support thereof. The pretrial conference is not likely to succeed without the hearty and decided co-operation of the bench and the bar, and the authorities stress the importance of that cooperation. In this connection, the Supreme Court of Wisconsin expressed its opinion in *Klitzke* v. *Herm*, 242 Wis. 456, 8 N.W.2d 400, as follows: 'There is general agreement that in order to accomplish the purpose of pretrial procedure and make it serve a useful purpose in the process of adjudication, there must be a spirit of co-operation between the court and the lawyers representing litigants . . . While a . . . judge carries a heavy responsibility, it must not be overlooked that attorneys . . . are almost always equally responsible for the results of a pretrial conference . . . If attorneys by their belligerency, stubbornness, or contumaciousness obstruct the course of the judicial process, they must in the end expect to bear the consequences of their misconduct.' Such co-operation could hardly be attained if the procedure at the pretrial conference is corrupted, thereby converting it into a procedure full of surprises and dangers.

"At the time the admission was made, the attorney for the appellees complied with his duty to facilitate the judicial procedure, giving the appellants the benefit of relieving them from the necessity of proving the admitted fact. No reasoning whatever can lead us to the conclusion that that admission has the scope attributed by appellants. To hold otherwise would be tantamount to encouraging the lack of honesty at pretrial conferences and to sanctioning dilatory tactics and attitudes at variance with their purpose, and such means, of recognized value in the simplification of judicial controversies, would suffer a severe blow with highly prejudicial consequences to their efficacy."

In overruling the *Alvarez* case the majority undertakes to elaborate the doctrine of the alleged implied or tacit acknowledgment authorized by Act No. 229.

The majority opinion maintains that Act No. 229 of 1942 allows the tacit or implied acknowledgment. The definition of this doctrine is found in the opinion rendered by Mr. Justice Negrón Fernández, today our Chief Justice, in *Elicier* v. *Heirs of Cautiño, supra*, and from which we copy:

"I think that the doctrine laid down in *Correa* v. *Heirs of Pizá, supra*, and followed in *Cruz* v. *Andrini*, 66 P.R.R. 119, and *Fernández* v. *Heirs of Fernández*, 66 P.R.R. 831, should be overruled and a new construction and scope given to the phrase *by voluntary action* to the effect that under subdivisions 1 and 2 of paragraph 3 of § 125 of the Civil Code, 1930 ed., which establish, respectively, that the father is obliged to recognize the natural child (1) when there exists an indubitable statement in writing of the father wherein he expressly acknowledges his paternity and (2) when the child has uninterruptedly enjoyed the condition of a natural child of the defendant father justified by acts of the same father or of his family, *the recognition resulting from an action brought by the child thereunder is by voluntary action, within the scope and purpose of § 2 abovementioned.*" (It refers to § 2 of Act No. 229 of 1942.) (Italics ours.)

If this were so, we would have to reach the inescapable conclusion that the Legislature realized a futile act in amend-

ing Act No. 229 in 1945 to grant adulterine children a right of action to claim their filiation when not acknowledged by the voluntary action of their parents or of the persons with a right to inherit therefrom, for the purpose of bearing the paternal surname. Because the result of the doctrine of tacit or implied acknowledgment would turn out to be that all the acknowledgments would always be voluntary whether they be voluntarily made by the father in the birth certificate, in a will, in public deed, or in an affidavit, or whether said acknowledgment stemmed from a judicial judgment rendered in a suit in which the child alleged and proved that there existed an indubitable document in which the father expressly acknowledged the paternity, or that he enjoyed the uninterrupted possession of the status of natural child of the defendant father.

When would a compulsory acknowledgment take place in which, pursuant to Act No. 243 of May 12, 1945, the adulterine child born prior to 1942 would be granted the right to bear his father's surname? Never, according to the opinion of the majority. However, no one can deny with good judgment that the Legislature established two types of acknowledgments of adulterine children born prior to 1942. One is by the voluntary action of the father or of the persons with a right to his inheritance. This acknowledgment is made for all legal purposes. The other acknowledgment is compulsory and it is permitted by law by virtue of a judicial action when said children are not recognized by the voluntary action of their parents or of the persons with a right to their inheritance. This acknowledgment is limited to the sole purpose of bearing the parents' surname.

Notwithstanding this provision the majority of this Court disregards the legislative mandate, ignores Act No. 243 of 1945 and decrees, by way of interpretation, that all acknowledgments are voluntary. Is it perhaps, as the majority opinion insinuates, that the only involuntary acknowledgment is that

in which the defendant father alleges and proves, of course, that the acts of acknowledgment with which the child charges him, were involuntarily made under violence or intimidation, through fear or mistake, or through charitable devotion to his neighbor? If this were the case, there would simply be no acknowledgment because in that case a judgment decreeing the filiation of the plaintiff child would not lie. But irrespective of the fact that the Court assumed legislative powers by annulling the will of the Legislative Assembly in disregarding the effectiveness of Act No. 243 of 1945, let us take as an example the unreasonability of the implied or tacit acknowledgment.

An adulterine child born prior to 1942 files an action of filiation against his alleged father. He invokes as a ground for the acknowledgment the uninterrupted possession of status of natural child of the defendant father and to prove said status alleges acts performed by the father himself and his family, which are actually false. The defendant father answers denying all the facts stated in the complaint and finally that he is the father of the plaintiff child. At the trial the plaintiff offers oral evidence, false and fabricated, to support the complaint. The defendant father in turn presents truthful evidence to rebut plaintiff's. However, in settling the conflict in the evidence and probably influenced by his own beliefs and idiosincracies the judge believes plaintiff and his evidence and renders judgment decreeing his filiation. The defendant exhausts every legal remedy to reverse or set aside or vacate said judgment. He wages the great battle of his life in the courts to overcome the injustice of the false paternity of the plaintiff child being imposed upon him. But it is all useless and the defendant will be, by judicial mandate, the father of the plaintiff child. This is an acknowledgment by the voluntary action of the father, according to the majority opinion. And let it not be said that we have gone to extremes in that example. We would

be quite naive if we believed that every judgment is based on the truth of the facts in controversy. A commentator of law has said, correctly, that some judgments may be explained because assaults are not only committed at cross-roads but also in the courts of justice.

In the above illustration, while the majority of the Court tells the defendant father that he has voluntarily recognized the plaintiff son, despite his firm resistance and opposition to plaintiff's claim, he shall have to think and with reason that a broken arm hurts.

Turning again to the majority opinion it says that the interpretation given by this Court to the phrase "voluntary action," greatly departed from the golden rule (it undoubtedly refers to one of the rules of legal hermeneutics) provided by Section 19 of our Civil Code which provides that the most efficient and universal means to discover the true sense of a law, *when its expressions are doubtful,* is to consider the reason and spirit thereof, or the cause or grounds which led the legislative power to dictate it. But, where are the doubtful expressions of Act No. 229? Why create a doubt where none exists for the sole purpose of invoking said Section 19 of the Civil Code? Because if something has been made clear it is that Act No. 229 of 1942 authorized the parents or the persons with a right to their inheritance, to do what was forbidden prior to that date; that is, to voluntarily recognize, for all legal purposes, the illegitimate children (adulterine or incestuous) born prior to the effectiveness of said Act. That is to say, to put them on the same footing, by voluntary acknowledgment, as the children classified by the Civil Code as acknowledged natural children. But, what was the juridical situation of those same adulterine children who were not recognized by the voluntary action of their parents or of the persons with a right to their inheritance? They had no other rights than those recognized to the illegitimate children and to which we have already

referred. They had no right of action other than that claiming support from their parents; but in 1945 the Legislature amended Act No. 229 to grant to these adulterine children the right to claim their filiation for the sole purpose of bearing their parents' surname. It should be noted that although the amending Act (Act No. 243 of May 12, 1945) was approved three days after the decision of the case of *Correa* v. *Heirs of Pizá, supra*, the bill for that Act must have been presented in the Legislature long before the *Correa* case was decided. I think this should be clear to those who are acquainted with the legislative procedure for the enactment of an act. It implies that the Legislature, knowing that the voluntary acknowledgment is that which is made by the father in the birth certificate, the will, in a public deed or in an affidavit, and that the adulterine child born prior to 1942 who was not thus recognized had no right to file an action of filiation, chose to grant him that right although limited to the sole purpose of bearing the parents' surname. It was therefore clear to the lawmakers that an acknowledgment obtained by judgment was not an acknowledgment by the voluntary action of their parents or of the persons with a right to their inheritance.

The application of the doctrine of implied or tacit acknowledgment is irreconcilable with the legislative action in approving Act No. 243 of 1945, amending Act No. 229 of 1942.

Another doctrine, in my opinion erroneous, sanctioned by the majority opinion is that Act No. 229 of 1942, as amended, requires no other proof than that of paternity. In other words, that the aforesaid Act No. 229 impliedly repealed Section 125 of the Civil Code establishing the cases in which the father is bound to recognize his child. The doctrine was set forth by our present Chief Justice, Mr. Negrón Fernández, in a dissenting opinion in *Armáiz* v. *Santamaría*, 75 P.R.R. 544 (1953), the text of which is fully copied in

the opinion. Act No. 229, as amended, insofar as pertinent, provides:

"In case the children referred to in this section are not recognized by the voluntary action of their parents, and in default of the latter, by that of the persons having the right to inherit therefrom, said children shall be considered as natural children for the sole purpose of bearing the surname of their parents. *The action of this recognition shall be prosecuted in accordance with the procedure fixed by the Civil Code of Puerto Rico for the recognition of natural children; It being understood, however,* That such a recognition shall only have the scope herein expressed." (Italics ours.) (Act No. 243 of 1945.)

For the majority of the Court the provision "The action of this recognition shall be prosecuted in accordance with the procedure fixed by the Civil Code of Puerto Rico for the recognition of natural children", has no meaning, and if it did, as it indeed has, the Court amends the Act to make it meaningless.[7] In addition to the arguments set forth in our decisions against the opinion of our Chief Justice, we copy below, as appropriate, the commentary made by Calderón, Jr., on said opinion at XXIII *Rev. C. Abo. P.R.* 264:

". . . The most significant and revolutionary opinion was the one delivered by Mr. Justice Negrón Fernández in which Mr. Justice Belaval concurred. Said opinion analyzes the legislative intent of Act No. 229, that is, to eliminate the differences between all the categories of illegitimate children existing in our legislation and it is concluded that 'to convey real meaning and full expression to that legislative intent, we must construe and apply Act No. 229 in a way that truly identifies both kinds of children, not merely in their juridical nomenclature, but in their actual opportunities of filiation, . . .' It is considered in this opinion that if section 125 were applied for the compulsory acknowledgment of adulterine, incestuous, etc., children, now called natural, the above-mentioned purpose would not be accom-

---

[7] Courts should not wipe out judicially a legislative provision unless it is shown that it is contrary to the legislative purpose. *Clínica Juliá* v. *Sec. of the Treasury,* 76 P.R.R. 476 (1954).

plished, taking into account the situation in which these children stand with respect to the actual natural children. This is so because it is almost impossible for the adulterine or incestuous child to prove the concubinage of its parents or the uninterrupted possession of status required by law as a ground for the action of compulsory acknowledgment. Therefore, as the opinion says, to sanction the principles of human equality stated in the Constitution of the Commonwealth of Puerto Rico and commended by outstanding exponents of the modern doctrine, it is necessary to conclude that the action of these illegitimate children seeking the compulsory acknowledgment should be governed by Section 129 of the Civil Code, that is, by the provisions referring to the right to support to which they are entitled once paternity is proved. Thus, once the paternity is proved judicially the acknowledgment is ipso facto established. The Judge does not believe that in the case under consideration neither concubinage nor the uninterrupted possession of status was proved and he is of the opinion that the rule of strong and convincing evidence in cases of possession of status should be disregarded as antijuridical. However, it affirms the judgment on the ground that paternity was proved.

"In our opinion, this decision, plausible for more than one concept, does not conform strictly to the vernacular juridical rules on the interpretative power of the judges. The judge has certain unsurmountable limits in construing the legislative purpose. As stated by Legaz y Lacambra 'the Judge, in accepting the content of the law . . . may determine its construction in one sense or another, but only to a certain point; for even when it depends on his will to choose restrictive or embracing interpretation . . . it is evident that this freedom can not go so far as to imply an alteration in the sense of the law: proof that not only what is clearly established in the law and, hence, needs no interpretation, but also the whole sense thereof, even in its most unspecific part, represents a barrier which can not be trespassed by the interpreter so long as he remains within his mission of trier and does not assume that of legislator.' In the present case, Act No. 229 designates all children born out of wedlock, natural children. It does not expressly provide that the acknowledgment of said children should be prosecuted in accordance with the Civil Code; it keeps silent on this particular. However, as correctly indicated by Mr. Justice Ortiz, in

the majority concurring opinion, 'we believe that it was the main purpose of the Legislature in enacting § 1 of Act No. 229 of 1942 to do away with any possible difference between natural and adulterine children born subsequent to the effectiveness of said Act. It was not its purpose to eliminate the requirements of proof contained in § 125. If such would have been the legislative intent, the Legislative Assembly would have expressly repealed or amended said Section. There was no implied repeal inasmuch as the creation of equality between children born out of wedlock is not incompatible with the necessity of proving the "status" of said children by means of certain type of evidence.' The Legislature, in creating Act No. 229, was conscious of the existence of Section 125 which governs filiation actions of natural children. By designating the illegitimate children born after the Act as 'natural', and by failing to repeal Section 125, the Legislature shows that it was its intention that the latter should also be governed by said section. Perhaps in the light of certain tendencies set forth in the opinion of Mr. Justice Negrón Fernández, the view stated above is not the one most justified. But it is not incumbent on the judge to change the enactments of a legislature, nor mould it arbitrarily to his own concepts, no matter how wise they are. Cardozo says: 'Where does the judge find the law which he embodies in his judgment? There are times when the source is obvious. The rule that fits the case may be supplied by the constitution or by statute. If that is so, the judge looks no farther. The correspondence ascertained, his duty is to obey. The constitution overrides a statute, but a statute, if consistent with the constitution, overrides the law of judges. In this sense, judge-made law is secondary and subordinate to the law that is made by legislators'. The judge can not act on the basis of what he believes the legislature meant to do, even less when the provision governing the matter was left in force. 'The laws should be construed on the basis of what the Legislative Assembly did and not on the basis of what it did not do'. . . ." (Pages 264–267.)

The alleged repeal of Section 125 of the Civil Code by Act No. 229 created a serious problem for the Court with respect to natural children in the concept of the legislation prior to said act. It was so admitted in the opinion from

which we copy: "The mind cannot conceive that the unacknowledged adulterous child, born before or after August 10, 1942, may obtain its filiation by merely complying with the simple rule of proof of paternity without having to go through the embarrassing provisions of § 125, while the natural child born prior to that date is compelled, for the same purpose, to comply strictly with the stern rules of proof imposed by said section." Yet on the basis of a citation from Professor Mascareñas the matter is readily and simply disposed of by deciding that the principle of equality before the law in the juridical treatment requires that the rule of mere proof of paternity be made extensive also to *natural children* born prior to 1942. Which is tantamount to saying, in other words, that Act No. 229 repealed section 125 of the Civil Code insofar as it defines the cases in which the father was bound to recognize the natural child as the same was known prior to 1942. Of course the problem arises because it has been maintained against every juridical reason that Act No. 229 repealed said section 125 with respect to adulterine and incestuous children. By such a decision natural children were placed in a disadvantageous position with respect to adulterine and incestuous children. We have already pointed out the way out used by the Court when it found itself at that crossroad.

A brief examination of Act No. 229 will show that said statute in nowise affects or refers to *natural children* born prior to its enactment.

Section 1 declares natural children all children born out of wedlock subsequent to the effective date of said Act, regardless of whether their parents could or could not have married at the time of the conception of said children.

Children born prior to Act No. 229 continued to be legitimate, natural or adulterine or incestuous as they are defined in the Civil Code. The status of the former *natural child*

was in no way altered by this Act. He continued to be the child born of parents who at the time of the conception or birth of the child could intermarry.

What is even more important, this section 1 of the Act confines itself to changing the former concept of "natural child" but it does not change the provisions of the Civil Code which expressly enumerate the cases in which the father is bound to recognize the natural child, even when he is born after 1942. Unless the Court, in the exercise of legislative functions, adds to said act a provision repealing section 125 of the Civil Code, said natural children may only compel their parents to recognize them in the cases established in said section 125. But more specifically, as to natural children born prior to Act No. 229, this section 1 does not even mention or refer to them.

Likewise, section 2 does not alter the status of natural child born prior to Act No. 229 nor change the procedure for its acknowledgment. Said section 2 authorizes the father or the persons with a right to his inheritance to voluntarily recognize, and for all legal purposes, the children born prior to 1942 who did not have the condition of natural children according to former legislation. In the event that these children are not thus recognized, they are granted the right to claim their filiation for the sole purpose of bearing the parents' surname, following the procedure fixed by the Civil Code for the acknowledgment of natural children. This being so, by virtue of what provisions of law or of what rule of construction is it stated that Act No. 229 of 1942 repealed section 125 of the Civil Code as to natural children born prior to the effective date of said Act?

It is finally maintained in the majority opinion that by virtue of the provisions of Article II of the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico refer-

ring to human equality[8] and of Act No. 17 of August 20, 1952, which grants to all children the same rights that correspond to legitimate children[9] to enjoy the equal rights as any child, whether he is born before or after 1890, blotting out the distinction that the former legislation established between legitimate, natural, and adulterine and incestuous children.

I concur with the majority opinion that after July 25, 1952, all children of a father deceased after said date, have with respect to their parents and the estate left by the latter, the same rights that correspond to legitimate children. It was so provided by the legislative power in enacting Act No. 17 of 1952. It is by virtue of this Act and not of the Constitution that all children born prior to July 25, 1952, enjoy the same rights to the hereditary estate that correspond to legitimate children, if the parents die after said date. And this is so because the law in force at the death of the predecessor is the one that determines the acquisition of the hereditary right. *Ex parte Orona*, 87 P.R.R. 800 (1963), and *Berdecía* v. *Superior Court*, 87 P.R.R. 100 (1963). It is something else to state that the Constitution eliminated or blotted out retroactively the distinction or categories of children established by former legislation. The Constitution here under consideration has prospective and not retroactive effect. Nor was it given retroactive effect

---

[8] "§ 1. [Human dignity and equality; discrimination prohibited]. The dignity of the human being is inviolable. All men are equal before the law. No discrimination shall be made on account of race, color, sex, birth, social origin or condition, or political or religious ideas. Both the laws and the system of public education shall embody these principles of essential human equality."

[9] Said Act provides:

"Section 1.—All children have, with respect to their parents and to the estate left by the latter, the same rights that correspond to legitimate children.

"Section 2.—The provisions of this Act shall have retroactive effect to July 25, 1952."

expressly, nor is it inferred from its clauses. The discrimination by reason of birth was absolutely prohibited from and after the births on or after July 25, 1952. It was so recognized with sound judgment by our Chief Justice when in the case of *Figueroa* v. *Díaz*, 75 P.R.R. 155 (1953), he said: "The chains which in our legislation still bound the fate of the children born out of wedlock to the discrimination of the juridical inferiority and to the disgrace of social indignity—and which in sound construction of law and sound justice might have been partly slackened in *Vargas* v. *Jusino*, 71 P.R.R. 362, dis. op., p. 369—were shattered to pieces at the impact of the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico, *the enactment of which repealed ipso jure, as regards the children born in, or after said date*, the precepts of the Civil Code and of the other laws which in one way or other established classes and categories of children, by reason of birth."[10] He then invoked the report of the Committee of the Bill of Rights of the Constitutional Assembly, submitted on December 14, 1951, explaining among other cases, the prohibition against discrimination by reason of birth and which reads:

"It is intended to eliminate the juridical stigma against children born out of wedlock. All children are guaranteed equal rights with respect to their parents and with respect to the juridical order. Illicit relations may and should be forbidden and this provision shall tend to discourage them. But the innocent offspring should come to the world free of juridical disqualifications or inferiorities. It is thus required by the principle of

---

[10] Mr. Calderón, Jr., agreed with the prospective effect of the Constitution in his article *"La Igualdad Jurídica Filial en Puerto Rico"* published in XVI *Rev. C. Abo. P.R.*, from which I quote:

"After July 25, 1952, therefore, the juridical and traditional nomenclature used in the different types of children was eradicated in Puerto Rico for children born after the effective date of the Constitution and of Act No. 17; from that date all are children, without modifiers, with identical rights. The new tendencies attained a complete and decisive victory, defeating the traditional regulation."

individual responsibility, pursuant to which no one is to blame for the acts which he himself did not perform. Although the present legislation already embraces most of the provisions herein set forth, new laws must be enacted. For the purposes of inheritance and of property, the changes resulting from this section shall not be retroactive to births occurring prior to its effectiveness."

The majority maintains, however, that the framers of this Report made a mistake in using the term "births" because what they actually mean to say was "deaths". So that according to the majority, the Report meant to say that for the purposes of the inheritance and the property the changes resulting from Section 1, Article II of the Constitution, should not be retroactive to deaths occurring prior to its effectiveness. In this manner the majority does not discard the Report as a means of interpretation, but changes it fundamentally at its own whim. Because it seems to me an exaggeration to attribute to the distinguished attorneys who were a part of the Bill of Rights Committee to have mistaken the general and ordinary meaning or the meaning in its juridical scope, of two terms which are so different such as *"birth"* and *"death."* It cannot be said, just like that, that the Constitutional Convention did not adopt that Report. It was neither opposed nor discussed in the debates. Hence it did not reject the scope that the Committee attributed to said Section with respect to the retroactive nature thereof. The Committee followed the principle of nonretroactivity of the Constitution as to the prohibition of discrimination by reason of birth.

Constitutions, like laws, have no retroactive effect unless it is expressly provided or it is inferred from its provisions beyond any doubt that such was the intention of the legislature. *Ayman* v. *Teachers' Retire. Bd. of City of N.Y.*, 211 N.Y.S.2d 198; *Schalow* v. *Schalow*, 329 P.2d 592; *Drennen* v. *Bennett*, 322 S.W.2d 585; *Minnesota Baptist Convention* v. *Pillsbury Academy*, 74 N.W.2d 286; *State* v. *Kansas City*

& *Memphis Ry. & Bridge Co.*, 174 S.W. 248; *Employees Retirement System* v. *Ho.*, 352 P.2d 861; *Shreveport* v. *Cole*, 32 L.Ed. 589; *White* v. *United States*, 191 U.S. 545; 11 Am. Jur. 641; 16 C.J.S. 121.

Neither the provisions of our Constitution nor the legislative background on the matter under consideration tend to indicate that the Constitutional Assembly had the purpose or the intention that said constitutional provisions should operate retrospectively.

Yet if it were true that the Constitution blotted out retroactively the differences and classifications between the children; if all of them deserve then the same juridical treatment, and the date of their birth is unimportant, then, either Act No. 17 of 1952, as it has been construed by the majority and as to which I agree, is unconstitutional insofar as it establishes a distinction between adulterine children whose parents died prior to July 25, 1952, and those whose parents died after that date, or there is an irreconcilable contradiction in the position assumed by the majority. Since for us the Constitution does not operate retrospectively, Act No. 17 of 1952 is constitutional as construed by us.

To close I wish to indicate that the final pronouncements enumerated from 1 to 8 in the majority opinion, constitute, in my opinion, a new Civil Code in the matter of filiation approved by this Court.

